J. C. and S. H. Kenner, Complainants, Appellants, *v.* City National Bank, Defendant, Appellee.

*(Knoxville,* September Term, 1931.)

Opinion filed February 15, 1932.

120

CATE, SMITH, TATE & LONG and STEINMETZ & LOWE, for complainants, appellants.

FOWLER & FOWLER, for defendant, appellee.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

This is a suit to recover some $180,000, the value of certain notes alleged to have been deposited by the complainants in defendant bank for collection and reinvestment of their proceeds. It is charged that these notes or their proceeds were fraudulently converted by defendant's cashier. The chancellor dismissed the bill and the Court of Appeals affirmed his decree. Complainants' petition for *certiorari* was granted by this court and the cause has been fully heard here.

Each of the courts below made an extended finding of facts and these findings largely concur. The concurrent findings, being amply sustained by the proof, are of course binding on this court. Code, section 10620.

Findings of fact by the Court of Appeals are binding on this court, unless challenged by petition for *certiorari*. Defendant bank has filed no petition for

*certiorari.  Hibbett* v. *Pruitt,* 162 Tenn., 285; *Brown* v. *Brown,* 155 Tenn., 530; *Bray* v. *Blue Ridge Lumber Co.,* 154 Tenn., 342; *Miller* v. *Kendrick,* 153 Tenn., 596.

Facts thus established, or facts undisputed on this record, are then, these:

On March 20, 1928, F. E. Haun, cashier of defendant bank, executed and delivered to the complainants a paper writing containing a long list of negotiable promissory notes aggregating $280,894.29. On the last page of this document, in Haun's handwriting, appears the following:

"March 20-28.  Received of J. C. & S. H. Kenner the above notes and cash $280,894.20 is acknowledged and collection or renewal will be attended to. City National Bank, F. E. Haun, Cashier."

In July, 1928, it developed that Haun was a defaulter to his bank and that he had defrauded others and had proven unworthy of the high confidence that his employer and the public generally had reposed in him. He was discharged by defendant bank and his criminal conduct became public.

Thereupon the complainants had their attorney go to defendant bank and demand the surrender of the notes receipted for by Haun as aforesaid. Search was made for these securities and in Haun's desk, not among the bank's bills payable, notes amounting to $99,636 were discovered. These notes were taken to be the property of the complainants and were turned over to them.

Prior to his connction with the City National Bank, Haun was cashier of a smaller institution known as the Knoxville Savings Bank. The latter bank was located near the business house of complainants and they were customers of that bank and became acquainted with Haun. They advised with Haun about their investments and

while Haun was at the Knoxville Savings Bank complainants purchased from him or through him various securities. Whether complainants were at that time dealing with Haun as an individual or with Haun as cashier of the Knoxville Savings Bank is not material in view of the findings of the Court of Appeals as to subsequent events.

In 1918 the City National Bank took over the Knoxville Savings Bank, the former bank purchasing all the stock of the latter bank. It appears without controversy, that, at the time of this transaction and for many years later, Haun enjoyed a reputation in banking circles and with the public as a young man of high integrity and unusual ability. It seems that the chief reason for the acquisition of the Knoxville Savings Bank by the City National Bank was to enable the latter institution to procure the services of Haun.

When the Knoxville Savings Bank was thus absorbed Haun was immediately made cashier of the City National Bank and for ten years exercised to the fullest extent his authority as cashier of that institution. The president and the directors of the City National Bank had the highest confidence in the honesty and efficiency of Haun and accorded him very large influence in the conduct of the affairs of that institution.

The complainants had a savings account at the Knoxville Savings Bank which was transferred to the City National Bank when the consolidation took place. Later they opened another savings account at the City National Bank and they also kept a checking account at that bank during the Haun regime. They continued to advise with Haun about their affairs after he went to the defendant bank and continued to buy for investment from him or through him notes supposed to be secured by real estate

liens. There is a controversy as to whether complainants were dealing with Haun as an individual or dealing with him as cashier of defendant bank, which is to be later noticed.

The Court of Appeals finds that some time in 1920 complainants rented a safety deposit box from the City National Bank; that they kept their notes in this box until a day or two before maturity, at which time they would turn them over to Haun for collection. That with the proceeds they purchased other notes, "as they claimed they thought, from the City National Bank through Haun, as its cashier," and put these new notes with their other notes in their safety deposit box, continuing to take the notes out a day or two before maturity, and turning them over to Haun for collection and reinvestment.

In this connection, it may be noted that the Court of Appeals found that the City National Bank never sold notes which it owned to individuals and that the only transactions of this character in which it engaged were rediscounts of its paper with the Federal Reserve Bank or with its correspondent bank. However, it seems that Haun would sometimes lend complainants money and take a note payable to the City National Bank and indorse it in the name of the City National Bank to the complainants, but this without the knowledge of other officers of that bank. This conclusion of the Court of Appeals is supported by the evidence, except as hereafter noted.

Complainants sold out their business in Knoxville, a jewelry and pawn broking establishment, on April 23, 1920. J. C. Kenner was in bad health and was spend-

ing most of his time in Florida. S. H. Kenner began to spend his winters in Florida.

About October 13, 1920, as set out by the Court of Appeals, Haun told the complainants that the makers of complainants' notes frequently came to the bank to pay them, or pay the interest on them, when complainants were not available, and the notes being in complainants' box, Haun said he was embarrassed. Haun suggested to complainants that they turn over all their notes to him so that he could at any time accept payment of a note, stamp it paid, and deliver it to the maker. He told them he would give them a receipt for the notes which would, in all respects, be good and binding. Complainants agreed to this, turned over their notes to Haun and he executed a typewritten list of the notes and at the bottom of this list he signed a receipt for the same. It further appears that Haun would at somewhat regular intervals give complainants a receipt for their notes on hand, taking up the previous receipt issued by him. Each receipt would show an increase in the amount of securities held by reason of profits reinvested. The receipts were all in form similar to that one heretofore set out.

It was found by the Court of Appeals that on October 13, 1920, the complainants took out of their safety deposit box and turned over to Haun notes amounting to $130,-038.40; that on January 3, 1921, they delivered to Haun another batch of notes aggregating $11,665; and that thereafter the complainants turned over to Haun from time to time other notes and cash. It may be again observed just here that defendant bank has filed no petition for *certiorari*.

Further finding the facts disclosed by the record the Court of Appeals says that, after turning over their notes to Haun as aforesaid on October 13, 1920, and January 3, 1921, complainants seem to have permitted and authorized Haun to attend practically to all of their business—"certainly all of it with the bank." The court relates that as a note would mature Haun would either collect the interest and take a renewal note or collect both interest and principal. That he would put the money thus gotten into complainants' saving account and would then lend it out to other persons, taking their notes. That this process would be repeated as the various notes matured. That Haun was not required to consult with the complainants and did not consult with them about making loans. That complainants trusted to his judgment and that in handling their affairs, Haun was authorized to draw on their savings account whenever he saw fit to do so.

Continuing the Court of Appeals set out that while complainants were in Florida, Haun would look after the collection of rents on their real estate, and that he would pay their taxes. That he would make out their income tax returns for them and pay their income taxes. That he had full authority to withdraw money from their savings account for these purposes and for the purpose of buying notes for them and for the purpose of lending their money for them.

The court states that the only checks which the complainants drew were against their checking account and that these checks were for money with which to pay their living expenses. That when their checking account would get low, Haun would either make the necessary entries or direct a clerk to make entries transferring money

from complainants' savings account to their checking account. That this was done by drawing checks, debit slips, or customer's drafts.

It seems that complainants kept no book recording their savings account with defendant bank after Haun took possession of their notes and began executing the receipts referred to. They say that Haun told them the receipts would answer the same purpose and it was not necessary for them to keep a book.

The Court of Appeals notes as a fact that when Haun's defalcations became known he had in his possession in his desk a total of only $99,636 of notes which belonged to complainants; that the other notes listed on the receipt or document executed March 21, 1928, were fictitious; that Haun was enabled thus to defraud complainants by reason of the fact that they had so completely turned over their money, notes, etc., to him to handle, invest, reinvest, etc., and had permitted him to draw on their savings account as stated. The Court of Appeals adds:

"The bank had no knowledge of Haun's relations with complainants. None of the notes which Haun sold or pretended to sell complainants were owned by the bank. It had no record of them, as it did of its own notes, and they were never put in its note files, but were simply kept by Haun in his desk."

The finding thus quoted is, in our opinion sustained by the proof, except that in two instances, perhaps, notes belonging to the defendant bank were sold to complainants by Haun, but as we understand the record no claim is predicated on that particular transaction.

The chancellor reached the conclusion that in the matters detailed Haun was acting as the agent of complainants, not as the agent of defendant bank, and that the

bank accordingly could not be charged with liability for Haun's fraud. And upon the theory that complainants dealt with Haun as cashier of defendant bank, and had not made him their agent in the premises, the chancellor was further of opinion that if on behalf of the bank Haun had undertaken so to handle complainants' securities, that undertaking was beyond the power of a banking corporation and that complainants were entitled to no recovery on this account. We understand the Court of Appeals to have affirmed the chancellor's decree upon the last ground—that such an undertaking on the part of defendant bank was *ultra vires*.

▮ The first proposition advanced in this court by the complainants is that the suit herein is based upon defendant bank's written agreement and receipt executed by it on March 21, 1928, whereby it acknowledged that it had received and held for collection and renewal certain notes aggregating $280,894.94 belonging to complainants and that while defendant bank denied the execution by it of said written instrument, the answer was not sworn to and that the written agreement therefore became conclusive against defendant bank. Code, section 9726.

This proposition has been elaborately discussed by counsel for both parties, with much reference to authority from this and other states.

We do not find it necessary to consider the question at any length. Under settled practice in equity, at least in this jurisdiction, the objection made to the answer came too late. The complainants took quite a volume of proof, after the answer was filed, tending to show that they dealt with Haun as an agent of the bank and tending to show that Haun had authority to bind the bank

in these dealings with complainants. The first hint of the objection now made to the answer came in exceptions of complainants to evidence offered by defendant bank tending to show that Haun did not represent the bank in his dealings with complainants and that Haun had no authority to bind the bank in such a way. This testimony was objected to on the ground that it was "incompetent and immaterial to or upon any issue in the case upon the receipt sued on." At the conclusion of the reading of all the testimony the complainants moved "for a decree upon the pleadings." This motion, and also these exceptions to defendant bank's proof, were overruled by the chancellor, and we think properly.

In *Wilson* v. *Eifler*, 47 Tenn. (7 Cold.), 31, this court said:

"A party who has the right to have a pleading disregarded or stricken out, for defective form or verification, must make his election in due time, and cannot, after treating it as valid, taking testimony upon the issue made by it, and going to a hearing upon it, then object, for the first time, to the validity of the pleading, and allege that all his own proceedings upon it were erroneous."

In *Seifred* v. *Peoples Bank*, 60 Tenn. (1 Baxt.), 200, objection was taken to a plea for defective verification. The court said:

"The plea is insufficient in its averments, and should have been taken from the files on motion, or stricken out on argument of its insufficiency for defect in its verification, that the defendant might have amended. Complainant waived his objection by waiting to make it on the hearing. There was no error in the action of the chancellor in refusing to treat it as a nullity, on account of the defective verification."

On the hearing of this case (*Seifred* v. *Peoples Bank*), below, Chancellor COOPER discussed this question of pleading with his usual learning. 2 Cooper's Chy. 20. Reviewing the authorities the chancellor shows that the proper method of taking advantage of a formal defect of this description is by an application for an order to set aside the pleading or take it off the files for irregularity. He quotes Judge OVERTON that "in pleading an advanced step virtually waives exceptions which should be antecedently made." *Snapp* v. *Moore,* 2 Tenn., 240. The chancellor refers to *Fulton Bank* v. *Beech,* 2 Paige, 307, affirmed on appeal, 6 Wend., 36, where the irregularity of a joint and several answer not being sworn to by one of the defendants, was cured by the replication of the complainant, after notice of the irregularity. Reference is then made to section 4322, Code of 1858, section 10400, present Code, "no replication or other pleading after answer filed is required or allowed, but all cases shall be heard as if replication has been filed, unless set for hearing expressly on bill and answer."

Chancellor COOPER said:

"In the case now before the court no motion to take a plea from the files for the irregularity in the affidavit was made, nor was it set for hearing upon its sufficiency, and the irregularity tested in that mode, under *Graham* v. *Nelson,* 5 Humph., 609. The defendant has had no intimation—to put him on his guard or give him the opportunity to amend—that objection would be raised to the form of his plea. If the complainant had, in any of the modes allowed by law, undertaken to treat the plea as defective, the defendant would have had the right, 'as a matter of course,' to file a new one properly verified. A court of equity cannot sanction a practice which is, in effect, laying a trap for the unwary."

In Chambliss' Gibson's Suits in Chancery, section 747, subsection 2, it is said:

"If a plea or answer, that must be sworn to, is filed without verification, or, if no verification is needed, is filed without being signed by the defendant, or his solicitor, . . . it may be taken off the files, on motion of the complainant.

██ Section 8750 of the Code provides that no plea in abatement shall be received in any court, unless its truth is verified by the oath of the party or otherwise.

Section 9726 of the Code provides that every written contract constituting the foundation of an action is conclusive evidence against the party purporting to have executed it, unless the execution thereof is denied under oath. This is merely to enact that an unsworn answer or plea to an action so based is ineffective, is frivolous, is irrelevant. Section 8727 of the Code provides that irrelevant or frivolous pleadings may be stricken out on motion.

If, as heretofore seen, an unverified plea in abatement, which the statute says shall not be received in any court, bcomes good, unless seasonable objection is taken thereto, a fortiori, an unsworn answer, against which there is no such ban, may become good if seasonable objection is not made thereto.

So we conclude, in view of the practice pursued herein, that this written contract did not become conclusive evidence against defendant bank but on the contrary the liability of defendant bank thereupon was put in issue.

██ The chancellor found in as many words that the transactions in which the complainants engaged with Haun were personal transactions and intended to be personal transactions and known to be personal trans-

actions with Haun all the time. That Haun was not the agent of the bank in his dealings with complainants.

The Court of Appeals, referring to their previous review of the facts, said:

"But, as stated, it seems to us that having so completely turned over their property and affairs to Haun to handle, invest, reinvest, etc. (acts far beyond the powers of a national bank to perform and engage in), and having permitted him to handle their affairs as his own for eight years, they (complainants) are chargeable with knowledge and notice that he was acting as their agent and not as cashier of the bank."

By this language the Court of Appeals obviously meant to find that by their conduct, their dealings and relations with Haun, and by reason of the circumstances of the case the complainants had made Haun their agent. That the law would ascribe to them an intent to make Haun their agent. In other words, that the agency of Haun for complainants was established by circumstantial evidence, regardless of complainant's claims to the contrary.

The fact of actual agency may be established, like any other fact, by circumstantial evidence. Mechem on Agency (2 Ed.), sec. 261, *et seq.*; 21 R. C. L., 820; 2 C. J., 444.

Here, then, is a concurrent finding of the lower courts that the complainants did confer upon Haun authority to act as their own agent in the matters before us.

In response to a petition for a further finding of facts the Court of Appeals said this:

"In our original opinion we expressed some doubt as to whether the Kenners thought they were dealing with Haun as the cashier of the defendant bank, but we did not pass upon the question. While we do have some doubt as to what the Kenners thought, yet we think they

carried the burden of showing that they thought they were dealing with Haun as the cashier of the bank and not with him personally, and we so find.''

It is insisted by counsel for the complainants that these two findings of fact by the Court of Appeals are inconsistent and counsel rely on the last finding.

We do not think there is an inconsistency between the conclusion last expressed and the conclusion first expressed. Both findings of fact are very well supported by the evidence. The effect of these two findings of fact is that while complainants dealt with Haun as the agent of the bank, nevertheless they made him their own agent also. This is a situation that frequently arises in human affairs and a situation that the courts have been called upon to deal with often. The rules of law applicable to such situations are well settled and have repeatedly been declared by this court. It is to be kept in mind that both the lower courts have found that the defendant bank was without knowledge of Haun's dealings with complainants in respect to the notes involved.

■ If an agent, without knowledge of his principal, represents the adverse party in a transaction, a contract so procured is voidable at the option of the uninformed principal. *Hawkins* v. *Byrn,* 150 Tenn., 1; *Robeson and Weaver* v. *Ramsey,* 147 Tenn., 25; *Siler* v. *Perkins,* 126 Tenn., 380; *Tisdale* v. *Tisdale,* 34 Tenn. (2 Sneed), 596; Mechem on Agency, Second Edition, sections 2137-2138; Clark and Skyles on Agency, section 405.

■ Such being the circumstances under which the contract between the complainants and the defendant bank, or Haun acting for the defendant bank, was executed, it is not enforcible against the bank and may be repudiated by that corporation. Defendant bank cannot be held on this contract as upon an obligation to take,

collect and renew the notes described, and this disposes of the case before us insofar as it may be regarded as a suit founded upon the written instrument exhibited.

The details of the transactions between complainants and Haun are, however, set out at some length in their bill, and the bill, favorably construed, in the alternative, prays for a decree for the value of complainants' notes, alleged to have been turned over to the bank for collection, and not returned but converted. The bill also includes a prayer for general relief.

While, therefore, for the reasons stated, we think defendant bank cannot be held on the contract sued upon, yet, as a condition of repudiation or rescission of that contract, the bank must be required to restore any property of the complainants that it received, or the value of that property if converted. A court of equity will, save in exceptional cases, impose such a condition upon disaffirmance permitted. *Brady* v. *Oliver*, 125 Tenn., 595; *Hawkins* v. *Byrn, supra,* and cases cited.

It must accordingly be determined what property of the complainants defendant bank received. The schedule of notes contained in the document upon which this suit is brought is not binding on the bank. Insofar as this paper writing is a mere receipt, it is subject to contradiction by parol evidence, although in its contractual features, as the obligation to collect and renew, it might not be so impeached. *Stewart-Gwynn & Co.* v. *Insurance Co.,* 77 Tenn. (9 Lea), 104; *Weisinger* v. *Bank,* 78 Tenn. (10 Lea), 330; 10 R. C. L., 1025; Wigmore on Evidence, section 2432. Proof offered in this case indicated that the greater part of the notes listed were fictitious.

Moreover, as said in Wigmore on Evidence, section 2432, a receipt is nothing but an admission. The

principal is bound by an admission or declaration of his agent only when that agent is acting in a matter within the scope of his authority, or at least his apparent authority. *Somerville* v. *Gullett Gin Co.*, 137 Tenn., 509; *Horrigan* v. *First National Bank*, 68 Tenn. (9 Baxt.), 137.

As heretofore seen, an agent who, without the knowledge of his principal, undertakes to serve his principal and another in a particular transaction is not proceeding within his authority. The effect of cases above cited is that an innocent principal is not bound by anything said or done on the part of his agent undertaking to act in the dual capacity mentioned. In the case before us it is obvious that Haun padded this list of notes to conceal his defalcations. Such list of notes, therefore, was a self-serving declaration on the part of Haun to hide his fraud, and there would be no justification for holding defendant bank bound by an admission of this nature.

The observations just made are applicable to all the receipts issued by Haun except the first one executed about October 13, 1920, when the complainants took their notes out of the safety deposit box and in person delivered them to Haun. According to their own testimony, the complainants never saw their notes any more until after Haun was discharged from the bank, when the remainder were found and turned over to them as set out above. They allowed Haun to handle the notes and took his word respecting the securities on hand and never verified the lists furnished them. The receipt given to complainants about October 13, 1920, appears to have been lost and was not available. The testimony indicates this receipt was in the same form as the later receipts. One of the complainants testified

that he kept a copy of the first list of notes and that copy was introduced.

The Court of Appeals has found that complainants delivered to Haun on October 13, 1920, notes amounting to $130,038.40; that they delivered another batch of notes to Haun January 3, 1921, amounting to $11,675; and that still additional securities and sums of money were delivered to Haun at later dates. The Court of Appeals did not make a definite finding as to the amount of these additional items and that must hereafter be determined.

In turning over the securities and moneys to Haun, mentioned in the last paragraph, complainants did not act through an agent but made delivery of the property themselves. They did not employ an agent in respect to these deliveries. That such deliveries to Haun by complainants of money for deposit and of bonds and notes for collection, complainants believing they dealt with Haun as cashier of the bank, amounted to deliveries to the bank is not, in our opinion, debatable. Haun was clearly assuming to act for the bank in these transactions, as is evidenced by the form in which he executed the first receipt, and by the finding of the Court of Appeals that complainants thought they were dealing with Haun as the cashier of the bank and not with him personally.

The authority of the cashier of a bank is well understood and is very broad. *Water Co.* v. *Bank,* 123 Tenn., 364; *Bank* v. *Bank,* 132 Tenn., 152.

The cashier of a bank has authority to receive money for deposit and he also has authority to receive the notes of customers for collection. In fact, defendant bank maintained a department for the collection of notes, drafts, etc., for account of its customers.

As averred in the bill and shown by the proof, the real understanding between the complainants and Haun was that the notes turned over would be collected and the proceeds thereof reinvested—the receipt reciting that the notes were taken in for "collection or renewal."

Insofar as Haun undertook to obligate defendant bank to attend to the reinvestment of the proceeds of the notes collected, we think that undertaking was beyond the scope of Haun's authority and not binding on defendant. The weight of the proof shows that he had no such authority, either actual or apparent. This was a thing not authorized by this particular bank and was a thing not usually done by this bank or other banks. *Continental Insurance Co.* v. *Schulman,* 140 Tenn., 481; *Bank* v. *Bank, supra.* Such being our view of the matter, it is not necessary to enter into a discussion of the doctrine of *ultra vires.* A few cases touching on that doctrine in situations similar to the one before us, however, may be noticed, because of the analogy.

In *L'Herbette* v. *Pittsfield National Bank,* 162 Mass., 137, 38 N. W., 368, 44 Am. St. Rep., 354, the cashier of the bank made an invalid agreement at the time of receiving a deposit to invest the money for the depositor in stocks and bonds paying interest on the money in the meantime. No investment of the money was in fact made and as we gather the money was embezzled by the cashier. The court said:

"There is no doubt that the cashier was a proper officer of the bank to receive deposits of money at the bank in its behalf (Morse on Banking, sec. 161), and there was nothing criminal or immoral in either of the agreements made by him. If those agreements were invalid because *ultra vires* or unauthorized, there certainly would be no reason why the bank should not be held to refund to the

plaintiff his money on demand, provided the bank had actually received it. The fact of the cashier's making the invalid agreements at the time of receiving the deposits would not entitle the bank to retain the money for its own use, or debar the plaintiff from recovering it back.

"Nor does the fact that the money, by reason of the cashier's misappropriation of it, did not actually come to the use of the bank, make any difference. The dealing between the plaintiff and the cashier was at the bank, and it was on the footing that in receiving the money the cashier represented the bank. The money was paid and received as and for money deposited in the bank. Suppose that no agreement as to the future investment of the money had been made, it could hardly be doubted that the money paid at the bank to the cashier, as and for a deposit in the bank, and accepted by him as such, would be treated as having been received by the bank, even though the cashier should embezzle it. The agreement was that the money should be invested by the bank; not that it should be invested by Francis. The making of this agreement does not impair the obligation which rests upon the bank by reason of the deposit of the money with its cashier. The bank is bound because its cashier, assuming to act in its behalf, received the plaintiff's money as money deposited in the bank; and the fact of his making invalid agreements, if his agreements were invalid, that the bank should at some time in the future invest the money for the plaintiff, and meanwhile should allow him interest upon it, does not have the effect to exonerate the bank from its liability to refund the money without interest to the plaintiff on demand, no investment thereof having been made by it."

We have quoted somewhat at length from the Massachusetts court as the reasoning employed is illustrative of that followed in other cases. *Emmerling* v. *First National Bank* (C. C. A. Eighth Circuit), 97 Fed., 739; *Arkansas Valley Bank* v. *McClenahan* (Ark.), 25 S. W. (2d), 772; *Decatur National Bank* v. *Henry,* 159 Ala., 367; *National City Bank* v. *Carter* (C. C. A. Sixth Circuit), 14 Fed. (2d), 940; *Wassman* v. *City National Bank* (C. C. A. Sixth Circuit), 52 Fed. (2d), 705.

So upon the whole case we reach the conclusion that defendant bank must account to the complainants herein for the money and the value of the notes which complainants are able to show that they turned over to Haun. For reasons heretofore stated, Haun's receipts subsequent to the receipt issued October 13, 1920, cannot be considered. Defendant bank is of course entitled to credit for all withdrawals by the complainants themselves and for all withdrawals made by Haun for investment for complainants, for the payment of complainants' taxes, insurance, etc., and for withdrawals by Haun from complainants' savings account of sums credited to complainants' checking account—the Court of Appeals having found that Haun had full authority to make withdrawals from complainants' savings account for such purposes.

In making out their case, the complainants appear to be relieved of any effort to show that they turned over to Haun on October 13, 1920, $130,038.40 of notes, face value, and on January 3, 1921, $11,665 of notes, face value. The Court of Appeals has found these facts in favor of complainants and these findings of that court have not been challenged in any manner that we can consider. The actual value of these notes is open to investigation.

We are of opinion that the bank is entitled to credit for all sums that the complainants receive from the bankruptcy court by way of dividends on their claim filed against Haun's estate. It does not appear that complainants have any demands against Haun except those growing out of these transactions with Haun while he was cashier of the bank. They filed their claim in the bankruptcy court upon stipulation that by so doing the rights of the parties to this suit should not be affected.

The defendant bank is not liable for any losses accruing by reason of Haun's investments or reinvestments of complainants' funds.

Numerous other questions have been discussed by counsel in brief and on argument. What we have said, however, appears to be decisive of the case at this stage and we forbear further elaboration.

The decree of the Court of Appeals is reversed and the cause remanded to the chancery court for reference and other proceedings, with leave to the parties to take additional proof if desired. One-third of the costs so far accrued will be taxed to the complainants and two-thirds of the costs so far accrued will be taxed to the defendant bank.