## W. W. DILLON & CO. v. SHARBER, et ux.

Middle Section. June 1, 1935.

Petition for rehearing denied June 15, 1935.

Petition for Certiorari denied by Supreme Court, February 15, 1936.

John R. Aust and Goodpasture & Carpenter, all of Nashville, for appellants.

Bell, Hibbitts & Russell, of Nashville, for appellee.

FAW, P. J. This is a suit, by original bill in the chancery court of Davidson county, brought by W. W. Dillon & Co., a partnership composed of W. W. Dillon, Sr., and W. W. Dillon, Jr., against A. L. Sharber and his wife, Kate T. Sharber, to obtain a judgment against the defendants for the sum of $1,200, with interest thereon at 5 per cent from October 30, 1928.

At the time of the transactions out of which this litigation arose, and at the time the bill was filed, the complainant was engaged in the "General real estate business" in the city of Nashville, Tennessee, and the defendants were resident citizens of Nashville.

While the cause was pending in the chancery court, and after the issues had been formed by bill and answer and a portion of the proof (including the deposition of W. W. Dillon, Jr.) had been taken, a decretal order was made and entered in the cause, as follows:

"In this cause it satisfactorily appearing to the court from statement of counsel and proof adduced that since the filing of the original

bill herein W. W. Dillon, Sr., has been adjudged a person of unsound mind and that M. G. Horkins has been by order of this court under date of June 16, 1933, appointed guardian of the person and estate of said W. W. Dillon, Sr., and is now administering said estate under orders of this court, and further that W. W. Dillon, Jr., has died since the institution of this suit and that all property and assets of W. W. Dillon & Co. are now properly in the possession and control of the said M. G. Horkins, the court is pleased to order and decree that the bill of complaint in this cause be amended by adding the said M. G. Horkins, Guardian for W. W. Dillon, Sr., as complainant, and the said suit may be prosecuted in the name of W. W. Dillon & Co. by M. G. Horkins, guardian.''

Thereafter the proof was completed and the cause was finally heard by the chancellor upon the entire record, when the chancellor decreed that complainant M. G. Horkins, guardian of the person and estate of W. W. Dillon, Sr., have and recover of the defendants the sum of $1,200, with interest thereon at 6 per cent from the date of the filing of the original bill herein, to-wit, June 18, 1930, together with the costs of this cause, and that execution issue therefor.

The defendants excepted to the chancellor's decree and appealed therefrom to this court and have assigned errors here.

It is alleged in complainant's bill that, some time during the early part of 1928, the defendants, A. L. Sharber and wife, were the owners of two separate ''properties'' in the city of Nashville, Tennessee—one known as the Belle Haven Apartment and the other known as the Nadroj Apartment—both of which are fully described in the bill; that title to said properties was vested in defendant Kate T. Sharber, and that defendants were desirous of making a sale of same or exchange for a farm, and listed said properties with complainant as real estate agent for the purpose of making sale or exchange; that complainant thereupon entered into negotiations with G. S. Moore & Son of Springfield, Tennessee, a partnership composed of G. S. Moore and Robert D. Moore, in an effort to induce them to exchange for the property belonging to the defendants a valuable farm located in the Eighth civil district of Robertson county, Tennessee, on the Springfield-Clarksville highway, which formerly had also been listed with complainant for sale and contained about 368 acres, more or less; that, as a result of much effort on its part, complainant finally arranged a trade between the defendants and G. S. Moore & Son, which was consummated by defendants executing a deed conveying the above described Nadroj Apartment to G. S. Moore & Son, and, at the latters' request, another deed conveying the Belle Haven Apartment to W. E. Clinard; that in consideration of the execution and delivery of said two deeds, G. S. Moore and Robert D. Moore executed and delivered a deed conveying the above-described Robertson County farm to Mrs. Kate T. Sharber.

Complainant further alleges in its bill that the question of the commission to which it was entitled was raised at the time the trade between the defendants and G. S. Moore & Son was made, the defendants being represented by Dr. A. L. Sharber, complainants by Samuel B. Bryan, and G. S. Moore & Son by Robert D. Moore; that it was then agreed that complainant was entitled to a commission of $2,500, of which $1,300 was to be paid by G. S. Moore & Son; and $1,200 by defendants Sharber and wife; that the commission thus agreed upon was only half the commission usually charged by real estate agents in Nashville as commissions in handling such transactions; that G. S. Moore & Son paid the $1,300 which was their portion of the commission, and that A. L. Sharber stated that the defendants were unable to pay their portion of the commissions at the time, as they had realized no cash from the trade, and he requested that he be allowed to give his note in the sum of $1,200, due six months from date, with the understanding that the same should be renewed when due for an additional six months; that complainant would not agree to this, as the defendant A. L. Sharber insisted upon giving his personal note, which note was not to be signed or indorsed by Mrs. Sharber in whom title to the farm was to be vested; that therefore complainant entered a charge on its books against defendant A. L. Sharber and Mrs. Kate T. Sharber for the sum of $1,200, and, although complainant had made repeated demands upon defendants for payment of said sum, they have refused or neglected to pay same, although the delay requested has long since expired.

Complainant prayed for a judgment against the defendants for the sum of $1,200, with interest at 5 per cent from the 30th day of October, 1928, and for general relief.

The defendants answered the bill and stated that, at the time mentioned in the bill, they owned "an equity" in the Belle Haven and Nadroj Apartments described in the bill; that "each of these properties had a large mortgage on the same."

Defendants state in their answer that it is true that defendants desired to dispose of said properties and defendant A. L. Sharber spoke to Mr. S. B. Bryan, a representative of complainant, about selling said apartments or exchanging them for other property, but that "no particular mention was made of a farm especially," and that defendant Kate T. Sharber had no knowledge with reference to this conversation between Dr. Sharber and Mr. Bryan; that Mr. Bryan was the only representative of complainant with whom defendants ever had any dealings regarding this matter; that, after some time had intervened, Mr. Bryan came to defendant A. L. Sharber with a proposition to sell him, or exchange with him, certain real estate belonging to G. S. Moore and Robert D. Moore, located in Robertson county, Tennessee, as described in the bill; that Mr. Bryan, the representative of the complainant, seemed to be representing G. S. Moore and Robert D. Moore, and defendants under-

stand that he was paid compensation by said G. S. Moore and Robert D. Moore for making the trade; that the deal was finally consummated and the conveyances were made as alleged in the bill; but defendants deny the allegations of the bill with reference to the commission.

Defendants allege in their answer that defendant Kate T. Sharber had no knowledge whatsoever regarding the matter of commissions and entered into no kind of agreement regarding same and did not understand that she was to pay a commission; that defendant A. L. Sharber was willing to make the trade provided the Robertson county farm could be disposed of; that Mr. Bryan, the representative of complainant, as well as Moore & Son, assured him that it could be disposed of; that Mr. Bryan was the only representative of complainant with whom defendants had any dealings, and that Bryan stated that he would dispose of the farm and charge a commission of $1,200 when the same was sold; that this was agreed to and no commission was to be paid until the farm was sold by the complainant; that defendant A. L. Sharber offered to execute his personal note. to be paid when the deal was finally consummated or the farm finally sold, which was to be within twelve months; that when complainant was unable to make the deal and sell the farm, defendants offered to convey said farm to complainant, subject to the encumbrances thereon, which complainant refused to accept.

Defendants deny that they are indebted to the complainant in the sum of $1,200, or in any other sum, and they deny that complainant is entitled to collect a commission from both parties, or that complainant can act as agent for both parties. Defendants allege that complainant has been paid for making the deal, having been paid by G. S. Moore & Son. All allegations of the bill not specifically denied or admitted are generally denied.

Upon the evidence, which consisted of the depositions of S. B. Bryan, Robert D. Moore, and W. W. Dillon, Jr., for complainant, and of the two defendants in their own behalf, the chancellor found the facts (as stated in his decree) as follows:

"It appears to the court that the defendant Kate T. Sharber was in 1928 the owner of the Belle Haven and Nadroj Apartments in Nashville, Davidson county, Tennessee, and that the defendant Dr. A. L. Sharber, acting as the agent of his wife, the defendant Kate T. Sharber, listed said property with W. W. Dillon & Co., real estate agents, in the early part of 1928, for sale or exchange. The court finds that S. B. Bryan, representing W. W. Dillon & Co., through advertising and other efforts, arranged a trade of said apartments for a large farm in the Eighth civil district of Robertson county, Tennessee, and owned by G. S. Moore & Son. This trade or exchange of properties resulted from the acts and efforts of W. W. Dillon & Co. bringing the parties together, and the trade was consummated

in the office of W. W. Dillon & Co. in Nashville, Davidson county, Tennessee. The court finds as a fact, that at the time the trade was consummated Dr. A. L. Sharber, acting as agent for his wife, Kate T. Sharber, agreed with S. B. Bryan of W. W. Dillon & Co., to pay a commission of $1,200, and that G. S. Moore & Son agreed and did pay a commission of $1,300, all as set forth in the original bill filed in this cause. The court is of opinion and finds from the record in this cause that the sum of $1,200 commission claimed by complainant for services rendered in this connection is a proper and reasonable charge for the services rendered the defendants.''

The appellants' assignments of error are numbered 1 to 7, inclusive, but they overlap somewhat, and the questions presented by these assignments will be disposed of in the order which seems most convenient.

There is a sharp conflict between certain witnesses in the case, with respect to the matter of agreement for the payment of commissions, and the assignments of error challenge the chancellor's findings of fact in material respects.

It appears, practically without dispute, that in the spring of 1928, complainant, through its employee S. B. Bryan, ''listed'' for sale, or exchange for other real estate, two separate apartment house properties in the city of Nashville—one known as the Belle Haven and the other known as the Nadroj—both of which were owned by defendant Kate T. Sharber, subject to heavy encumbrances. The Belle Haven was subject to two mortgages, aggregating $39,000, and the Nadroj was mortgaged for $22,000. Defendant A. L. Sharber is a physician, and was at that time and for many years theretofore practicing his profession in Nashville. Complainant had no written authority from either of the defendants to ''list'' said apartments, but S. B. Bryan ''listed'' same pursuant to a conversation with Dr. Sharber, believing that Dr. Sharber was the owner. However, this belief on the part of Bryan was not induced by any representation of Dr. Sharber, other than the inference which might be drawn from the fact that Dr. Sharber undertook to authorize the negotiation of a sale or exchange of the apartments.

In the autumn (probably in October) of the year of 1928, G. S. Moore & Son (Robert D. Moore), of Springfield, Tennessee, in response to an advertisement by complainant, opened negotiations through complainant for the exchange of a farm of 368 acres in Robertson county, Tennessee, for the two apartment house properties. Dr. Sharber went with Bryan and ''looked over'' the farm, and thereafter they (Dr. Sharber and Bryan) met Robert D. Moore in the Nashville office of complainant and agreed upon an exchange of the two apartment house properties for the farm of the Moores, which farm was encumbered with a mortgage to secure a debt of $15,700. Deeds were prepared in the office of complainant and were

subsequently executed by the parties in accordance with the aforesaid parol agreement between Dr. Sharber and Robert D. Moore; that is to say, Dr. Sharber and his wife, Kate T. Sharber, executed and delivered deeds conveying the apartment house properties as directed by G. S. Moore & Son, and G. S. Moore & Son executed a deed to defendant Kate T. Sharber for the Robertson county farm, and the grantees went into possession of the property conveyed to them, respectively.

The matters of dispute in the testimony relate to the alleged contract for the payment of a commission by defendants. Complainant was represented entirely by S. B. Bryan throughout the transaction, and Bryan dealt altogether with Dr. Sharber. Bryan states in his testimony that he never saw Mrs. Sharber during the entire negotiations and "never had any agreement with her in any shape, form or fashion," and the testimony of Mrs. Sharber is to the same effect. Bryan did not learn that Mrs. Sharber owned the apartments until the preparation of the deeds was taken up, and he was then so informed by Dr. Sharber.

The substance of the testimony of Mr. Bryan with reference to a contract with Dr. Sharber for the payment of a commission to complainant will appear from an excerpt from his deposition as follows:

"Q. At the time the trade was made, Mr. Bryan, was the question of the commission due W. W. Dillon & Company raised? Yes, sir.

"Q. Was any agreement made as to the amounts the respective parties would pay? A. Yes, sir.

"Q. Then just tell us how that was done, and what the agreement was? A. Well, when the question of commission was brought up, after the trade was all agreed upon, why we asked full regular commission, of course; they both stated as it was an exchange, one piece of property for another, and another piece had to be sold, they thought they ought to divide up that commission in a way, and charge them about half commission, and we finally agreed to that. I told them that we would do that, that as we were exchanging property we would agree to charge each half of the commission, as he had his other property to sell, so Robert Moore said he would gladly pay what he considered his half of the commission, which was $1300.00, on his farm; and Dr. Sharber, then they wanted to pay $500.00 and $750.00, and on up to a thousand, and I took it up with Mr. Dillon, and told him the situation, and he said—

"Q. Just a minute. You cannot tell what Mr. Dillon said. What did you finally agree with Dr. Sharber as to the commission that he was to pay? A. $1200.00, with Dr. Sharber.

"Q. Did he agree to pay $1200.00 commission? A. Yes, sir.

"Q. Of your own knowledge do you know whether or not that has ever been paid? A. It has not been paid.

"Q. After that time did you ever have any discussion with Dr. Sharber relative to the commission which he was to pay? A. Yes, sir, several times.

"Q. Did he ever question the amount? A. No, sir.

"Q. What was the nature of your discussion with him as to the commission? A. Well, I sent him a statement for the commission, and he called me, and asked me to come down, and I asked him to take care of it right away, he asked me to come down and said just as well be able to pay that now, but not to push him now, he would pay it just as soon as he could get in something. . . .

"Q. Mr. Bryan, after the agreement was reached as to the amount of the commission that each of the respective parties in interest would pay, was or not any question raised as to the length of time in which the payment was to be made? A. Yes, sir.

"Q. Did you have any discussion as to that with Dr. Sharber? A. Yes, sir.

"Q. State just what the discussion was. A. Well, the doctor wanted to give a note; he said that he didn't get any money out of the trade, and didn't have any money, and would have to do about before he could get up the money, and it would probably be six or twelve months before he could have it, and he would like to give this note for six months, and with an agreement to renew it another six if he didn't have the money by that time.

"Q. Was the note accepted, did he give the note? A. No.

"Q. What kind of a note did he offer to give? A. He wanted to give his personal note for it.

"Q. Were you willing to take his note? A. No, sir.

"Defendant excepts to that as testimony relating to a compromise that was not accepted.

"Q. Why were you unwilling to take the note? A. Well, when we found the property was all being deeded to Mrs. Sharber, and had made the trade with Mrs. Sharber, we asked that Mrs. Sharber sign the note with him if we were to take the note.

"Q. What did Dr. Sharber say to that? A. He said he wasn't going to say anything to Mrs. Sharber about it, wasn't going to and didn't expect to, as her health was not the best and he didn't want to worry her with it.

"Q. When did this discussion take place that you speak of? Was that, or not, on the same day the trade was made? A. On the same day the trade was made.

"Q. Was it or not made prior to the actual consummation of the trade? A. Yes, sir.

Dr. Sharber's version of the controverted matter of a commission to the complainant for the sale of the apartments appears from an excerpt from his deposition as follows:

"Q. You knew that Dillon & Company were representing Moore & Son? A. Yes.

"Q. Did you, or not, assume that they would be paid—Dillon & Company would be paid by Moore & Sons? A. Yes, I assumed that.

"Mr. Russell: We object to what he might assume.

"Q. Did you later understand that they were paid? A. Mr. Bryan told me that they were paid.

"Q. Did you agree to pay Dillon & Company anything for making this exchange for you? A. No, sir.

"Q. Did they ask you to pay them anything for making an exchange? A. Yes.

"Q. Did you decline and refuse? A. I declined, and we had a verbal agreement, Mr. Bryan and I had a verbal agreement that he would, within twelve months, resell this farm and that my commission to him for this resale of the farm would be $1200.00, and he was to take out of the proceeds of the farm his commission.

"Q. And until he sold the farm then you owed him no commission? A. None at all.

"Q. In other words, you were to pay no commission for the exchange that was being made between Mrs. Sharber and Moore but you gave Dillon & Company, through Mr. Bryan, their representative, the right to resell the farm for you, at which time you were to pay him an agreed commission of $1200.00? A. Yes, for a resale.

"Q. That is right. And it was to be paid only if and when it was resold? A. That is right.

"Q. Is that the only agreement you ever had with them? A. Relative to that?

"Q. Relative to the commission? A. Yes.

"Q. Did he ever resell it? A. No.

"Q. I believe it is true that right after the deal went through that farm property went down considerably? A. It evidently didn't get any better; it had been represented to me that it would.

"Q. Doctor, did you ever offer to give Mr. Bryan or W. W. Dillon, Jr., or anyone else connected with Dillon & Company, your note for commission? A. No, sir, no, sir.

"Q. Did they ever ask you for a note? A. Yes, Mr. Bryan did, so he stated to me, at the instigation of Mr. W. W. Dillon, Jr."

On cross-examination Dr. Sharber was asked and answered as follows:

"Q. At the closing of the deal, Dr. Sharber, didn't you agree with Mr. Bryan representing Dillon & Company, and Mr. Robert Moore, representing himself and his father, that a fair commission on the sale of this property would be $2500.00, and that a fair division of the commission would be $1300.00 for Moore & Son and $1200.00 for Mrs. Sharber, and didn't you agree to pay that amount? A. No, sir, I did not. I would like to tell you just what happened.

"Q. Just go ahead and explain, but you can't tell what the conversation was. A. As a matter of fact, Mr. Moore never sat in when any discussion of a commission was mentioned with Mr. Bryan. Mr. Bryan and I sat alone, Mr. Bryan tried to get me to agree that when he re-sold this farm for me that I would agree to give him $2500.00, as a matter of fact, and he told me that Gil S. Moore & Sons were going to give him $2500.00 for making this transfer of the Robertson County farm for these two apartments, but later in his deposition he stated that Moore & Son, I think, paid him $1300.00. Now as a matter of fact, what happened in that conference was this, that Mr. Bryan knew that Mrs. Sharber was not to be approached on this matter, that she was ill, he knew as a matter of fact that I had no money, I was transferring property that was bearing an income for a property that had no income, which I found out later, and he finally agreed, rather than have the sale fall through and get no commission, he was getting a commission from Gil S. Moore & Son, rather than get no commission, no sale, he agreed verbally with me which he promised he would submit in writing that when this farm was sold, and he said he could sell it within a year because farm conditions were going to get better, wouldn't matter whether Al Smith was elected or Hoover was elected, that some legislation would be done to help the farmers and that he could sell this farm within a year, he was satisfied of that, that he then would take his $1200.00 out of the proceeds of the sale of the farm. Later when I asked Mr. Bryan why he didn't reduce this verbal agreement to writing he said that little Dillon—that is young Mr. W. W. Dillon, Jr.,—wouldn't permit him to.

"Q. Where did that conversation take place, Doctor? A. In his office.

"Q. Who was present? A. Mr. S. B. Bryan and I, there was never mention of a commission when anybody else sat in, Mr. Moore never sat in on an agreement relative to commission which I should pay or which he should pay, I don't know what he was to pay, except what Mr. Bryan told me. Mr. W. W. Dillon never sat in on this conference."

Complainant is suing upon an alleged contract, and the burden is on complainant to prove the contract as alleged by a preponderance of the evidence. Neither Mr. Bryan nor Dr. Sharber is a disinterested witness. Under his contract of employment with complainant company, Mr. Bryan was to receive 50 per cent of the commissions collected from the transactions here in question and he states that he will get 50 per cent of any recovery collected in this case, and will get no further compensation in the absence of a recovery. His interest in the result of this lawsuit is, therefore, practically equal to that of the complainant, and insofar as the testimony of a witness may be affected by interest in the result of the litigation, he stands on no righer ground than Dr. Sharber.

It seems obvious that complainant has not established the contract alleged, unless the testimony of Mr. Bryan is corroborated by other evidence.

Complainant read the depositions of Robert D. Moore and W. W. Dillon, Jr., neither of whom had any personal knowledge of an agreement between Mr. Bryan and Dr. Sharber with reference to commissions. We quote from the deposition of R. D. Moore as follows:

"Q. Did you pay any commission to Dillon and Company on this trade? A. Yes, sir.

"Q. How much? A. Thirteen Hundred Dollars.

"Q. What was your understanding about that commission, Mr. Moore?

"Mr. Carpenter: Defendants object to a statement of any understanding.

"A. I talked with Mr. Bryan about it.

"Mr. Hibbitts: Q. I don't want you to tell me what he said. I just want you to tell me what was done? A. I paid this thirteen hundred dollar commission as my part, as I understood it the commission was to be twenty-five hundred dollars.

"Mr. Carpenter: Defendants object to any understanding.

"Mr. Hibbitts: Q. Are you familiar with the prices customarily charged by real estate men in Nashville? A. Fairly so.

"Q. What would be a customary fee for a case of this magnitude, Mr. Moore? A. I would say Twenty-five Hundred Dollars would be a reasonable fee.

"Q. Twenty-five Hundred Dollars. Is it or not customary, where a real estate firm negotiates a trade between two parties as was done in this instance, to charge a smaller commission than is customarily charged where they only represent one party?

"Mr. Carpenter: Defendants object to the custom that might be in contravention of a rule of law, as a custom could not change a rule of law.

"(Question read) A. It is on a trade to charge a smaller commission than on a straight sale, at least it has been that way in my business."

In his deposition, W. W. Dillon, Jr., was asked and answered as follows:

"Q. Have you ever had any discussion with Dr. Sharber or Mrs. Sharber relative to the payment of the twelve hundred dollars? A. Discussed it with Dr. Sharber on several occasions.

"Q. Was that prior or subsequent to the consummation of the trade? A. It was after the deeds had been passed that I talked with Doctor himself.

"Q. Just what did Dr. Sharber say concerning the payment of this twelve hundred dollar commission? A. The doctor wanted to

give a twelve months' note with the privilege of renewing it for six months.

"Q. Did you agree to that or not? A. I agreed to take the note if Mrs. Sharber would sign it jointly with him.

"Q. Was that done or not? A. No, sir.

"Q. Why, if you know? Did Dr. Sharber give any explanation? A. He, as I recall it, said that Mrs. Sharber was not well at the time and he didn't want to bother her about it.

"Q. Did he in any way question the amount of the fee? A. No, sir.

"Q. Did he in any manner question his liability or his wife's liability, for this fee? A. No, sir.

"Q. About how many times did you discuss the payment of this fee with Dr. Sharber? A. Twice I am sure, in his office.

"Q. The fee has never been paid? A. No, sir."

We also quote an excerpt from the cross-examination of W. W. Dillon, Jr., as follows:

"Q. You never did in any way at all, even up to this time, discuss this trade in any way at all with Mrs. Sharber, did you? A. No.

"Q. Do you recall when and where you discussed this matter with Dr. Sharber? A. In his office.

"Q. You went up there to rent space in the Bennie-Dillon Building to Dr. Sharber and his associates? A. No, I went to see Dr. Sharber especially about the commission. I have talked to Doctor about renting space, but when I discussed the commission.

"Q. Why I will ask you if you didn't go up there and discuss the matter of renting space in the Bennie-Dillon Building with Dr. Erwin and Dr. Sharber, and while you were there, you casually discussed this matter with Dr. Sharber and he at that time denied his liability and offered some kind of compromise? A. No. I went with Mr. Bryan specifically to talk to Dr. Sharber about the commission and he never denied liability.

"Q. He never had admitted it, he never has paid it? A. He offered to pay it by a note.

"Q. And that was the twelve months' note, and that was on condition that the farm be disposed of within twelve months? A. No, sir, he never mentioned the farm when he was talking to me about the commission.

"Q. Never mentioned the disposal of the farm to you at all? A. No, sir.

"Q. You never heard that; you didn't know that he wanted to get rid of the farm? A. When we were talking about the commission, he didn't mention the farm one way or the other.

"Q. Did he ever mention the disposal of the farm to you? A. Yes, later on he asked if we could sell it or dispose of it for him.

"Q. And agreed to pay a commission, he did that, didn't he? A. Nothing said about it."

Dr. Sharber denied that he at any time offered to give his note to complainant for $1,200, or any other sum; but we find no denial by Dr. Sharber of the statement of W. W. Dillon, Jr., that, subsequent to the consummation of the trade, he went on two occasions "specifically to talk to Dr. Sharber about the commission," and "he (Dr. Sharber) never denied liability," and never mentioned the disposal of the farm as a condition of his liability for a commission. A demand upon, or an appeal to, Dr. Sharber by W. W. Dillon, Jr., for the payment of a commission would naturally evoke a denial of liability if Dr. Sharber did not understand that he owed such commission; and his silence, under the circumstances disclosed, may be considered as evidence of an admission of liability. 3 Jones on Evidence (2 Ed.), sec. 1044, p. 1923; Queener v. Morrow, 1 Cold., 123, 129. This affords strong corroboration of the testimony of Bryan to the effect that Dr. Sharber agreed and contracted to pay complainant a commission of $1,200, and we so find.

But it does not follow that defendant Kate T. Sharber is liable to complainant for a commission of $1,200, or any other sum. The undisputed proof is that she was the owner of the two apartment house properties, subject to the aforesaid encumbrances thereon; that whatever Dr. Sharber did in the way of "listing" the apartments with complainant for sale or exchange was done without her "authority or knowledge;" that her first information of the proposed exchange was after it had been agreed between Dr. Sharber and Robert D. Moore and about the time the deed was brought to her, at her home, for execution; that she understood at the time she signed the deed that complainant represented G. S. Moore & Son in the transaction; that she did not know at that time, and not until the bill in this case was filed, that complainant claimed that it was representing both parties to the exchange of properties and was claiming that she was liable to it for commissions.

We quote from Mrs. Sharber's deposition as follows:

"Q. Mrs. Sharber, I will ask you if at any time prior to the sale of these apartments of yours, or subsequent to the sale thereof, if you ever agreed to, or if anyone ever asked you, that is, anyone representing Dillon & Company asked you, or had any understanding or agreement with you whatsoever regarding any commission that you were going to pay for that deal? A. Not one word. They were all total strangers to me. I had never seen this Mr. Bryan until months afterwards.

"Q. I will ask you, so far as Dillon & Company were concerned, or any representative of theirs, if you knew of your own knowledge that they were claiming any commission until this lawsuit was filed? A. I was in total ignorance of any contract, direct or implied, with any member of Dillon & Company.

"Q. If it should be proven or shown here that W. W. Dillon & Company were attempting to represent both parties, yourself and Moore & Son, did you have any knowledge of it, or did you ever agree to it? A. I had no knowledge of it.

"Q. Did you ever agree to it? A. Certainly I did not. I did not have anything in the world to do with any member of that firm, remotely or otherwise."

The testimony of Mr. Bryan and W. W. Dillon, Jr., is to the effect that they had no communication whatever with Mrs. Sharber, and Bryan says that he "never had any agreement with her in any shape, form or fashion."

Each of the properties involved in the transaction was so heavily encumbered that, as Bryan testified, "it was merely an exchange of small equities." The result of the trade was "disastrous" to Mrs. Sharber. She testified that she endeavored to get the mortgagee to take over the farm for the mortgage debt without foreclosure proceedings, but this was declined, and she then endeavored to get "some tobacco man" at Springfield to take the farm off her hands "for the mortgage;" but that this proposition was also declined; that finally she "had to go $8000 deeper in debt to get rid of this farm at all."

Appellants invoke the rule that an agent cannot represent two principals whose interests are adverse. Tisdale v. Tisdale, 2 Sneed, 596, 608, 64 Am. Dec., 775; Siler v. Perkins, 126 Tenn., 380, 391, 149 S. W., 1060, 47 L. R. A. (N. S.), 232; Hawkins v. Byrn, 150 Tenn., 1, 10, 261 S. W., 980; Kenner v. City National Bank, 164 Tenn., 119, 136, 46 S. W. (2d), 46; 2 C. J., pp. 763-765.

"In general, an agent may, with their full knowledge and consent, represent both parties to a contract, and his contracts, under these circumstances, bind each within the scope of his authority. But where an agent, without the full knowledge and consent of his principal, represents the adverse party in a transaction, his contracts relating thereto are voidable at the option of the principal. The payment of a bribe, secret commission, or gratuity to the agent by a third party as an inducement for entering into contractual relations on behalf of his principal, or an agreement to pay such commission, will entitle the principal to avoid the contract." Siler v. Perkins, supra, 126 Tenn., 380, at page 391, 149 S. W., 1060, 1063, 47 L. R. A. (N. S.), 232.

This doctrine is founded on public policy, and applies regardless of the fact that the agent may have acted in good faith and the principal was not injured by the breach of duty. 2 C. J., pp. 764, 765; Tisdale v. Tisdale, supra, 2 Sneed, 596, at page 608, 64 Am. Dec., 775.

In the instant case, Mrs. Sharber, by executing the deeds, ratified the agreement made by Dr. Sharber with G. S. Moore & Son

for the exchange of properties; but she did not ratify or become a party to any agreement Dr. Sharber may have made with complainant relative to the payment of commissions, because she executed the deeds without knowledge or information of such agreement, or that complainant was claiming to represent her, and in the belief that complainant was representing G. S. Moore & Son.

Mr. Bryan, representing complainant, learned before the "trade" was consummated that Mrs. Sharber was the owner of the property, and he made no effort to acquaint her with the fact that complainant would claim commissions from her.

Knowledge is an essential condition to ratification, and there can be no ratification where the principal is ignorant of the facts. 21 R. C. L., p. 928, par. 107; 13 R. C. L., p. 1170, par. 196; 2 C. J., p. 495, sec. 115; Hart v. Dixon, 5 Lea, 336, 339; Walker v. Walker, 7 Baxt., 260; Evans v. Buckner, 1 Heisk., 291.

The mere fact that Dr. Sharber was the husband of his codefendant, Mrs. Kate T. Sharber, did not constitute him her agent for the purpose of employing complainant to sell her property and contracting to pay commissions. "A husband has not, by virtue of the marital relation, any authority to act as the agent of his wife or to make any agreement on her behalf binding her rights without her consent. His authority as agent for his wife is no more extensive in scope or longer in duration than that of any other agent similarly constituted." 13 R. C. L., p. 1168, par. 194.

Although Dr. Sharber was not authorized to bind Mrs. Sharber to the payment of commissions to complainant, he could bind himself. He listed the apartment house properties with complainant without disclosing the fact that he was not the owner, and he thereby induced complainant to perform the services rendered. 21 R. C. L., p. 895, par. 69; pp. 914, 915, par. 93. Moreover, he is bound by his promise and agreement, made with full knowledge of the dual employment of complainant, to pay complainant $1,200 for the services rendered at his instance.

It results that the assignments of error on behalf of defendant Kate T. Sharber are sustained, and the decree against her is reversed and the bill is dismissed insofar as it is brought against her.

The assignments of error on behalf of defendant A. L. Sharber are overruled, and the decree against him is affirmed, and a decree will be entered accordingly against him and the surety on his appeal bond.

The costs of the cause, including the costs of the appeal, will be divided; one-half of same will be adjudged against the complainant and the surety on his cost bond below, and the remaining one-half will be adjudged against defendant A. L. Sharber and the surety on his appeal bond.

Crownover and DeWitt, JJ., concur.

On Petition for a Rehearing.

FAW, P. J. On a former day of the present term, this court affirmed a judgment of the chancery court of Davidson county, part 1, in favor of M. G. Horkins, guardian of the person and estate of W. W. Dillon, Sr., and against Dr. A. L. Sharber, for $1,200, with interest thereon from June 18, 1930, and for the costs of the cause.

A petition for a rehearing has been filed on behalf of Dr. Sharber, through which it is insisted that the finding of this court, that Dr. Sharber agreed and contracted to pay W. W. Dillon & Co. $1,200 for services rendered, was based upon an erroneous appraisal of the evidence.

Complainant's witness Mr. Bryan testified, in substance and effect, that Dr. Sharber promised to pay W. W. Dillon & Co. $1,200 for services rendered in effecting the exchange of properties shown in the record, and that this promise was not upon condition that W. W. Dillon & Co. would sell the Robertson county farm or upon any other condition, except that he would want six or twelve months' time in which to pay said sum.

On the other hand, Dr. Sharber testified, in substance and effect, that he declined and refused to pay W. W. Dillon & Co. anything for effecting the exchange of properties, but that he agreed that if Bryan (for W. W. Dillon & Company) would sell the Robertson county farm within twelve months he would pay $1,200 commissions.

Both Bryan and Dr. Sharber were interested witnesses, and, as the burden was on complainant to prove the contract upon which its suit was based, it seemed obvious that the complainant's suit must fail unless the testimony of Mr. Bryan was corroborated by other evidence. We found such corroboration of Bryan in the testimony of W. W. Dillon, Jr., to the effect that, subsequent to the consummation of the exchange of properties, he went, on two occasions, "specifically to talk to Dr. Sharber about the commissions," and "he (Dr. Sharber) never denied liability," and never mentioned the sale of the farm as a condition of his liability for a commission.

"The silence of a party when a statement is made in his presence, against his interest, and is heard and understood by him, and is made in such way as to call upon him to deny it, if untrue, and the facts are within his knowledge, and the statement is made under such circumstances as naturally to call for a reply, amounts to an admission of the truth of the statement made, and may be sufficient to establish the fact as against him." Ency. of Ev., vol. 1, p. 367.

So, in our former opinion, we said:

"A demand upon, or an appeal to, Dr. Sharber by W. W. Dillon, Jr., for the payment of a commission would naturally evoke a denial of liability if Dr. Sharber did not understand that he owed such commission; and his silence, under the circumstances disclosed, may be considered as evidence of an admission of liability. 3 Jones on

Evidence (2 Ed.), sec. 1044, p. 1923; Queener v. Morrow, 1 Cold., 123, 129. This affords strong corroboration of the testimony of Bryan to the effect that Dr. Sharber agreed and contracted to pay complainant a commission of $1,200, and we so find.''

We are content to adhere to our former opinion, and the petition to rehear is denied and dismissed at the cost of the petitioner.

Crownover and DeWitt, JJ., concur.