JOSEPH P. CAVALLO, Appellee, v. RICCO GATTI, JR., and FRANK E. BURAN, Appellants.—392 S. W. (2d) 843.

Western Section, at Jackson. March 11, 1965.

Certiorari Denied by Supreme Court August 2, 1965.

530

Jess Ewing and Ross B. Clark II, Memphis Rubert & Ewing, Memphis, of counsel, for appellants.

W. C. Rodgers and Warren Miller, Memphis, for appellee.

AVERY, P.J. (W.S.). This cause comes from the Chancery Court of Shelby County, Division One, Chancellor Hoffman presiding. It involves the sale of a

miniature golf course, the purchaser alleging in the original bill that on account of misrepresentation by the original defendants, and the failure of the title to a portion of the ground upon which the miniature golf course was located, complainant was entitled to a rescission of the contract and to recover the cash payment made in the amount of $4,000, and have cancelled the balance of the consideration evidenced by promissory note in the amount of $4,000; that he have interest on the amount of the cash payment from the date of its payment to the date of the cancellation of the deferred payment and decree of the Court in this cause, together with damages for the breach of warranty in said contract.

In the contract which is styled "BILL OF SALE", the granting clause is as follows:

"KNOW ALL MEN BY THESE PRESENTS, That we, Ricco Gatti, Jr. and Frank E. Buran, of Memphis, Shelby County, Tennessee, in consideration of Four Thousand and No/100 ($4,000.00) Dollars and other good and valuable consideration, the receipt of which is hereby acknowledged, do hereby grant, sell, transfer and deliver unto Joseph P. Cavallo the business known as Fran-Ric's Miniature Golf Course located at 3463 Larmar Avenue, Shelby County, Tennessee, including the following property, to-wit:

"All of sellers interest in and to the lease on said premises.

Use of the name Fran-Ric's for a period of three (3) years.

1—Frame building housing miniature golf office and concession stand.

1—Wood frame and corrugated metal storage building.''

(Then 24 items including all of the light poles, fixtures and items of personal property usually found at such entertainment spot, are described.)

The habendum and warranty are as follows:

''To Have and to Hold the said goods and chattels unto the said Joseph P. Cavallo, his executors, administrators and assigns, to his own use and benefit forever. And we, Ricco Gatti, Jr. and Frank E. Buran, do avow that we are the true and lawful owners of said business, goods and chattels; that we have full power, good right and lawful authority to dispose of said business, goods and chattels in the manner aforesaid; and that we will warrant and defend the same against the lawful claims and demands of all persons whomsoever.

''IN WITNESS WHEREOF, we have hereunto set our hands this 16th day of May, 1963.

''/s/ Ricco Gatti, Jr.
Frank E. Buran.''

For the remaining $4,000 complainant grantee, Joseph P. Cavallo, executed his note with interest at 6%, principal and interest payable in 24 consecutive months, the first payment to said defendants of $177.29 due August 1, 1963.

Complainant executed a Chattel Trust Deed conveying every item purchased to Jess D. Ewing as Trustee, securing the payment of said note, containing the usual escalator maturity clause, maturing at the option of the holder of said indebtedness, the entire balance, ''without notice to the undersigned'', and authority of foreclosure.

In this trust instrument there are a great many provisions which prevented the maker of the note from selling to anybody the property contained in the bill of sale and trust deed, without the written permission of the holder of the note, and further on demand of the holder of the secured debt, the maker of the note agreed to provide any additional collateral security that might be demanded, and maturing the entire balance for failure to comply with provisions stipulated in said trust instrument authorizing foreclosure as in default of any payment.

The original bill charged complainant was overreached by many false representations, both expressed and implied, describing them; that the owner did not have the sole and exclusive right to the use of a substantial portion of the land and premises on which the equipment and facilities were located, same being on lands of others; that the income to be derived from the operation of this miniature golf course were:

"not even remotely as profitable as the defendants held it out and represented that it was; that in truth, they knew and withheld from the complainant the fact that said business was not even profitable, and could not be profitably or successfully operated."

The bill was filed August 6, 1963. Defendants obtained an extension of time to answer to September 1, 1963.

The answer was filed on September 3, 1963. In it defendants denied all the material allegations of misrepresentations contained in the original bill, and said they had no interest in the involved land covered in the leasehold but a leasehold interest and that this was quitclaimed to the complainant by an assignment. They deny that defendants had any knowledge that any part of

the land on which the golf course was located was owned by any person other than their original lessor; deny they have practiced any fraud of any kind in the procuring of the $4,000 in cash and the $4,000 note and chattel trust and denied that complainant has any right to have a rescission of the sale, cancellation of the note or other relief.

In the answer it is admitted that complainant on July 29, 1963, wrote defendant Gatti Jr. that he wanted to rescind the transaction, which letter is marked Exhibit 3 to the complainant and admit defendants refused to rescind. The answer admits the execution of the "bill of sale", the note and deed of trust. They exhibit same with their answer, and aver complainant failed to properly operate the business; had defaulted under the terms of his purchase agreement; failed to make payment and they had declared the balance of complainant's debt due, demanded the trustee to foreclose the deed of trust, which was done, and sale had on the 27th day of August 1963, at 1:00 P.M. for the balance owing of $4,000.

In this answer the defendants demanded a jury to try the issues of fact.

The cause was first heard before the Court and a jury on or about November 14, 1963, when two Issues were submitted to the jury as follows:

## "I

"Did defendants represent to and lead complainant to believe that he could make enough profit from the operation of the miniature golf course in question, during each season, to pay operating expenses and to pay his monthly notes of $177.29?

"Answer 'Yes' or 'No': YES.

"II

"Did the defendants know at any time prior to the sale of the golf course that any portion of the physical layout of the golf course encroached on the land of an adjacent owner?

"Answer 'Yes' or 'No': NO"

After the jury had reported the defendants moved the Court for a decree in their favor in which they state that Issue No. 1 was not a jury question and as a matter of law should not have been submitted to the jury and that the defendants were entitled to a verdict on the whole proof.

That allegations of the bill were not supported by proof of fraududent representations of material facts, and the proof greatly preponderates in favor of the defendants and against the complainant. That the Chancellor as the thirteenth juror, should disapprove the jurors' verdict in response to Issue No. 1 and enter a decree in favor of the defendants.

After the motion was filed defendants applied for further time in which to file briefs which was granted until December 31, 1963.

The cause was taken under advisement by the Chancellor and his Memorandum Opinion was filed on June 23, 1964, in which the Chancellor held the real substance of the bill was set forth in substance that.

1—The sellers had misrepresented the golf course to be a profitable operation and that the complainant had made diligent and vigorous effort and was unable to place the course on a profitable basis.

2—That a substantial portion of the minature golf course encroached on the land of an adjacent owner and as a consequence complainant was compelled to abandon the operation of the course.

He sustained the motion of the defendants to set aside the verdict of the jury on Issue No. 1, that the representations made by the defendants to the complainants were not with respect to past or existing facts, and that which they had made with respect to future facts was merely prophesy, which, however, had not come true; that Issue No. 1 was not a material Issue and that the jury's response should be disregarded.

As to the second matter he did hold that the enroachment upon the golf course owned by an adjacent owner was such a material encroachment that a substantial failure of consideration with respect to the original contract had existed which justified a rescission of the contract and recovery back of the money paid, or the value of the goods advanced.

He again held that since the defendants had foreclosed the deed of trust and that the equipment et cetera had been moved from the place and that the balance of the property covered within the lease could not be made profitable for operation without a material and substantial expenditure, if at all, and that his failure of consideration was:

"* * * one that was so fundamental as to defeat the object of the parties in making the agreement; that the encroachment was a matter of such prime importance that the contract would not have been made if such encroachment had been expected or contemplated by the parties. Therefore the complainant is entitled

to a rescission of the contract and a recovery back of the money paid,''

and he decreed accordingly for the complainant.

After the hereinabove referred to memorandum opinion of the Court was filed on June 23, 1964, the defendants then filed a motion for new trial, grounds of which are set out therein as error on the part of the Court in holding that a substantial failure of the consideration existed justifying a rescission and that such failure of consideration was not known by either party until July 1963, when a survey was run, that the land covered in the lease covered 81,172 square feet, but the area in the encroachment only covered 2,184 square feet, and that the encroachment could have been corrected at a nominal cost estimated in that motion at $220.00, and that the change could have been made without interfering with the operation of the miniature course on the land covered in the lease, and that the Court has erred in not holding that the encroachment upon the adjacent owner's property amounted to nothing more than an immaterial breach of contract insufficient to justify a rescission.

Response to that motion was filed in which the complainant excepted to any consideration by the Court of that motion and moved to strike the defendants' ''motion for new trial''. The grounds raised were that the motion came too late, either covered by the 10 day rule, or 15 days or the 30 day rule following the verdict of the jury; that they waived the motion for new trial by filing a written motion in arrest of judgment, which was styled:

''MOTION OF DEFENDANTS, RICCO GATTI, JR., AND FRANK E. BURAN FOR A DECREE IN THEIR FAVOR''

and urged that motion in arrest of the verdict of the jury and the judgment of the Court thereon, and having so filed said motion in arrest of judgment, they could not now contend they were entitled to file this last motion for new trial.

On July 27, 1964, the Court entered an order, the first paragraph is as follows:

"The Court has considered the defendants' motion to be allowed to amend their answer to conform to the proof regarding the testimony at the trial, over the complainant's objection, about the cost and feasibility of rearranging and relocating the miniature golf course in question so that it would not encroach on the land of an adjacent owner."

"This motion was made during the course of the trial and was overruled by the Court, as is shown by a portion of the transcript which has been furnished to the Court.

"The Court is of the opinion that to allow the Answer to be amended would give unconscionable advantage to the defendants and work an irreparable injury to the complainant; since a foreclosure sale was had at the defendants' instance in August, 1963, prior to the time that their answer was filed and all of the goods, material, fixtures and obstacles comprising said golf course were sold and carried away; thereby rendering it impossible, in the opinion of the Court, for the complainant to meet the defendants' testimony regarding the cost and feasibility of rearranging and relocating the said golf course.

"An order overruling the motion will be submitted for entry."

The Court then entered the final decree in which he reiterated the procedure that had been followed, outlining each step that had been taken at the trial and the decree was entered cancelling and rescinding the original contract for the sale of the golf course by defendants to complainant and for a judgment against Ricco Gatti, Jr. and Frank E. Buran, defendants, for complainant in the sum of $4,000, together with interest at 6% from the date of the trial; that the bill of sale, chattel deed of trust and promissory notes executed in connection therewith be cancelled.

To that action of the Court exceptions were saved in this manner, appeal to this Court prayed and granted, and the defendants allowed 60 days in which to file appeal bond, bill of exceptions and "otherwise perfect their appeal". This last order was entered on July 30, 1964. The bill of exceptions shows it was tendered on September 24, 1964 to the Chancellor, and was then signed by him. There appears after the certificate of the Chancellor a statement signed by counsel for the complainant and defendants, in which it is said:

"It is stipulated between the parties hereto through their counsel of record that the original exhibits may be transferred to the Court of Appeals in lieu of the Clerk's copying same."

This stipulation does not set out what the exhibits are and of course the only consideration to be given to these exhibits will be such exhibits as appear to have been properly identified by the Court.

There are seven assignments of error. Assignments of error Nos. I, II, III, IV and VI are levelled at the action of Court in holding that a substantial portion of

the miniature golf course encroached on the lands of adjacent owner and that the encroachment constituted a substantial failure of consideration.

Assignments of Error V and VII are levelled at the action of the Trial Court in overruling defendants' motion to amend their answer so as to conform to the proof concerning the cost of relocating the portion of the golf course so as to place it within the bounds of the landed area described in the involved lease, and to show that the entire golf course could have been relocated on Lot No. 7 described in the lease, at a cost of $220.00.

These assignments pose only two questions:

NO. 1: IS THE ENCROACHMENT OF THE GOLF COURSE ON LAND NOT EMBRACED IN THE LEASE AGREEMENT A SUBSTANTIAL FAILURE OF CONSIDERATION? IN OTHER WORDS, COULD THE GOLF COURSE BE SUCCESSFULLY OPERATED BY REMOVING THAT PORTION OF IT CONTAINED IN THIS OVERLAP ON OTHER PROPERTY?

NO. 2: DID THE TRIAL COURT ERR IN OVER-RULING DEFENDANTS' MOTION TO AMEND THEIR ANSWER SO AS TO CONFORM TO THE PROOF CONCERNING THE COST OF RELOCAT-ING THE PORTION OF THE GOLF COURSE UN-DER THE CIRCUMSTANCES SO AS TO PUT ALL OF IT ON THE AREA (LOT NO. 7) WHICH IS EMBRACED IN THE INVOLVED LEASE?

Let us answer Question No. 2 first. In arriving at the proper answer to this question we need to state the chronological action in connection with this lawsuit, as follows:

1—The lease was originally executed on November 14, 1961 by one Cora Mae Pearson to Ricco Gatti, Jr. It was for a period of two years from the 1st day of December 1961 to November 30, 1963, with right of renewal for an additional two years to begin the 1st day of December 1963, and end the 30th day of November 1965, this renewal option to be exercised by the lessee on or before November 15, 1963 by written notice to the lessor or her agent (Van Court Rental Agency). It contained the provision under the heading:

"Amendment to Article No. 5-And/or any other lawful business not in direct competition with any business operated by the Lessor or relatives of Lessor in this immediate area."

2—Bill of Sale executed to complainant by defendants on the 16th day of May, 1963.

Soon thereafter the controversy began between the parties, but the exact date is not shown. However, on July 29, 1963, the complainant wrote a letter addressed to Mr. Ricco Gatti, Jr., Sterick Building, Memphis 3, Tennessee, in which he said:

3—

"Dear Sir:

"As you know, you sold me Fran-Rick's Miniature Golf Course for the sum of $8,000, $4,000 of which I paid you in cash. And, as you likewise know, you had no title to a substantial portion of this golf course when you sold it to me. Further, I believe you will agree that you substantially, if not grossly, misrepresented the income possibilities and prospects of this enterprise.

"All of which defects have been emphasized by a demand on the part of the rightful owners of a portion of said course for a lease or rental contract with them..

"All of which also, as you can readily see, makes the whole transaction void and a gross imposition on me. My efforts to operate this little business makes me know that you knew that it was not a profitable one when you represented it to be and impressed it upon me.

"Wherefore, I here and now tender back to you said business and golf course, in at least as good condition, and, in fact, much better condition, than it was when you delivered it to me; and demand that you rescind my contract with you and return to me the $4,000 cash which I paid you, together with my note for the alleged balance owing you.

"I enclose herewith the lease, the four keys which you delivered to me at the time of purchase and all insurance policies covering said premises, being Transcontinental Insurance Co. policies Nos. 935413 and 935436 and U.S.F. & G. policies Nos. GL 819503 and SJ 540049. Please let me have remittance to cover, and my note.

"Thanking you, I am

"Yours very truly,
Joseph P. Cavallo."

On the same date, July 29, 1963, by registered mail, Mr. Gatti, Jr. one of the defendants, responded by letter addressed to complainant, saying:

"Re: Fran-Ric's Miniature Golf Course, 3463 Lamar Avenue Memphis, Tennessee

"Dear Sir:

"I am returning herewith all of the papers which I received from you, on July 29, 1963, by registered mail, dated July 29, 1963, which included the following:

1. Your lease agreement which was assigned to you, approved by the landlord, which you accepted and assumed all obligations under the lease, which assignment was executed by you.

2. Your policies of insurance, transferred to you at the time of sale, being policies #GL819503 and #SJ540049 with the U. S. F. & G. Insurance Company, and policies #935413 and #935436, with Trans-Continental Insurance Company, all written through Wm. B. Clark & Company.

3. Four (4) keys to the golf course which were affixed to a piece of cardboard.

"On behalf of myself and Frank E. Buran, I do hereby refuse to accept your attempt to turn your business, known as Fran-Ric's Miniature Golf Course, over to us and cancel your contract.

"Yours very truly,
Ricco Gatti, Jr."

On August 6, 1963, the bill was filed.

On August 15, 1963, an order granted defendants to September 1, 1963, to answer.

7—August 16, 1963, Trustee advertised involved property for sale.

8—August 27, 1963, the property was sold by Trustee to Mr. Gatti for $4,000, balance due on secured note.

9—September 3, 1963, Answer filed.

10—November 6, 1963, Survey made Exhibit 18 to Brown showing overlap on lot 6.

11—November 14, 1963, Trial had.

Soon thereafter the movable fixtures were taken from the land area involved. The exact date is not shown.

The consideration for the lease originally executed and which was assigned or transferred by the sale to complainant apparently embraces all of what is referred to as Lot No. 7 facing Lamar Avenue or Highway No. 78. The back end of this lot marched with Pearson Avenue for a distance of about 187 feet, and angles away from said Avenue a distance of 47.8 feet. A drainage ditch crossed that end of the lot next to Pearson Street from its southeast corner to a point 50 feet north of its southwest corner, and there appears to be a wooded area as shown by the plat, just north of this drainage ditch. Mr. Brown who is connected with Pickering Engineering Company, made the plat and survey, and testified in this case, which plat and survey is made Exhibit 18 to his testimony. It plainly shows the overlap of that portion of the miniature golf course located somewhat west of the west line of said lot 7, which is 21 feet wide at the south end and comes to a point 3.5 feet inside the northwest corner of said lot No. 7. It plainly shows that five of the light poles containing flood lights that served the golf course area are located on lot No. 6. By photo-

graphs and by positive proof it is shown on this overlap area are three of the holes referred to in the proof and the photographs, show certain concrete structures located within this overlap area which are a part of the golf course. The best view of these are shown by photographs in color, Exhibits 10, 12 and 13 to the evidence of Mr. Gatti.

The record shows that the lot covered by the lease was amply large enough to have accommodated the entire golf course, and in laying out the fixture or decorated equipment to put on the golf course the original lessees simply laid that out partly on lot No. 6, and which lot No. 6 they never at any time had a lease.

It is insisted at the time the case was being tried it only cost about $220.00 to have lifted these items from the actual position where they were located on lot No. 6 and put the whole course back on lot No. 7. This is the testimony of Mr. Gatti, but as a matter of fact, when the evidence is carefully considered it is evident that these concrete structures had been placed as a part of the golf course outside the area covered by the lease and over on lot 6 were sort of immovable things, and that new structures would have to be built. Furthermore, it is shown by the proof that the whole golf course structure would have had to be rearranged in order to put it on lot No. 7. The Trial Court so found. Furthermore, it is shown that all of the equipment which was covered in the lease had been sold and moved, at least that which was covered in the lease had been sold and moved, at least that which could be moved out of the area covered in the lease and covered in the bill of sale, as well as off the overlap area of the golf course proper. The owner of this overlap was

insisting on rent payment therefor if the golf course continued to occupy it.

■■ So it is that during this trial on the date hereinabove shown, a motion or effort was made to amend the original answer to make it conform to this proof with respect to this cost of putting the golf course on the area covered by the lease, which is lot No. 7. The Chancellor, as hereinbefore stated, said that this would be unfair to the complainant, not only because of the overlap itself, but because of the fact the defendants had seen fit to foreclose that deed of trust and move this equipment from this golf course area before the trial, and it would be inequitable burden to permit them to amend that answer so as to conform to this proof with respect to putting this entire golf course over on lot 7. In this we think he was entirely correct.

It is true that Courts of equity should be and are generally liberal in the allowance of amendments to pleadings, necessary to enable the party to have his side of the controversy fully presented on its merits; but the Court is under no obligation to favor a party who is interposing obstacles to a hearing on the merits which would work hardships on other party or prevent Court from decreeing equitably. Gibson's Suits in Chancery, 5th Ed. Sec. 436, p. 494, Vol. 1. In that same section it is stated that:

"1. The Proposed Amendment Must Be Pertinent and Germane to the Controversy, and must be of such a character that it will either enable the applicant the better to present his case, or will enable the Court the better to understand the controversy, and to do complete justice between the parties.

"2. The Application to Amend Should Be Made at the First Opportunity after the applicant has learned of the necessity of the amendment, or of the existence of the facts on which his application is based.

"5. And the Application to Amend Should Be Accompanied by an Offer to Pay Such Costs, or to comply with such other terms and requirements the Court may impose, as the price or condition of allowing the amendment to be made."

All that is said in the motion here embraced is that amendment be made to conform to the proof. The wording of the proposed amendment is not put into the motion nor filed therewith. No written amendment is offered to the Court. No notice of such contention had been given to the complainant, and in fact, so far as this record shows at the time this motion was made, the lease had already expired, or at least it had not been renewed, and it would have been an impossibility, without a re-negotiation of the entire lease, for this complainant to have been afforded a chance to locate the golf course, which had already been removed. Had the defendants not foreclosed the chattel trust deed, and had they not removed the things that were necessary to the operation of the golf course, they would have been in far better position to have had the Court pass favorably upon the amendment. Furthermore, had they set forth the wording of the amendment that they proposed to make, it would have looked far better in this record.

It is evident from this record that the defendants were using every possible legal haste that could be used to dispose of this golf course before this trial, and had been successful in having extension of time granted in which to answer to do just that, before the answer was

filed, and from the entire record it is obvious that the Chancellor exercised the soundest kind of judgment, under the equity rules, in denying the proposed amendment to the answer.

In addition to Sections 434 and 442 of the 4th Edition of Gibson's Suits in Chancery, the appellants rely upon Seaton v. Dye, 37 Tenn.App. 323, 263 S.W.(2d) 544. A careful reading of that case shows that the amendment offered was in no wise repugnant to justice sought, and it is not applicable here for the reason if amendment had been granted this course would be completely repugnant to the justice which might have been granted had the defendants acted less hastily in removing golf course, thus making it beyond the power of the Court to put the complainant back in status quo.

There is nothing in any of the cases relied upon to support the contention of defendants with regard to the action of the Court in disallowing the amendment that even indicates that either of the parties in those cases would have been put to an injustice, or had been placed in such inequitable position to the other so as to prevent the amendment aiding the Court to reach an equitable decision with respect to the question involved in those cases.

It is obvious that even if the Chancellor had allowed the amendment to the answer, that after the removal of the objects for which the contract had originally been consummated,—which in this case was the operation of the miniature golf course, the party insisting upon such evidence being competent, would have had to have freed itself from any act or acts which made it proper for the Court to render a judgment in damages rather than a

rescission. So it is, as the Court said, there was no way for the Court to have granted complainant equitable relief unless he be entitled to rescission.

◼ Thus we come to the proper answer to Question No. 1. In a bill to rescind a contract, whether the party desiring a rescission is the grantor or grantee, contractor or the contractee, vendor or vendee:

"The bill must be definite and certain and must aver positively the facts on which the complainant relies for relief; general allegations and conclusions of law are not adequate; nevertheless, it is not necessary, nor indeed proper, for a complainant to set forth all the details and minute facts constituting the grievance for which he complains. Gibson's Suits in Chancery, 5th Edition, Vol: 2, page 234, Section 994. * * *

"On a bill for rescission because the consideration was grossly inadequate, the Court will inquire 1st, would a sane man, uninfluenced by some cause not explained, make such a contract; 2d, would the defendant if a fair man take such a contract; and 3d, if he would, ought a Court of Equity to permit him to do it." Gibson's Suits in Chancery, 5th Edition, Vol. 2, page 234, Section 993.

◼ In a case seeking rescission of a contract it is similar in many respects, to a bill seeking specific performance. In all such cases Courts of Equity have regard to the rights of the parties, rather than to their situation as complainants or defendants. It is fundamental that the Courts will not rewrite a valid written contract for a party. There must be something about it that the Courts can determine that had the facts all been known to both parties, or at least to the party who seeks rescis-

sion or one who seeks specific performance, would not have entered into the contract.

We have in this case the question of contract or passing of title to certain personal property and also the passing of the right under specific real property lease, which contained option of renewal, covering the real estate upon which this personal property referred to as a golf course had been placed.

One of the specific charges in the bill is as follows:

"This complainant would now show that said representations, both express and implied, were grossly false: First, the defendants did not have the whole and legal right to said premises on which said golf course was located, but to only a part thereof, which the defendants knew and concealed from this complainant, when they sold and delivered to him said enterprise or business, and of which this complainant later learned by reason of a demand from the rightful owners of a substantial portion of said premises, that he negotiate with them for the use and right to occupy and operate thereon;"

That statement, it seems to us, is a positive and specific statement to make. Whether the referred to representations with respect to earnings etc. were made or not, and whether the defendants knew that they were conveying to the complainant a right to use certain real estate which they had not leased and themselves no right to use, and which was not described in their lease, which they admit they assigned to the complainant, for the specific purpose of conducting a business known to both parties to be that of a miniature golf course and a substantial portion of that area on which the golf course was located

did not lay upon the land described in the lease, but upon land of a third person, who demanded additional rents to the $140.00 set forth in the lease, not only covering the primary period, but a period embraced within an option, plus the lease rent or value of the 2800 plus feet covered by a portion of the golf course.

The proof in this case shows conclusively that what the defendants were seeking to do, was to get the Court to rewrite the original contract. First, they wanted it rewritten because they say at that time they could have made an arrangement or some agreement with this person who owned the area covered by part of the golf course which is not embraced within their right to occupy. Secondly, they say they want this contract enforced because the purchaser could have by the expenditure of certain funds, moved that portion of the golf course in question from lot No. 6 to the area within lot No. 7. They insist that this could have been done by a slight movement of poles and the movement of certain holes that are necessary in a miniature golf course; certain of the attractions or decorations which were over in this area that they were not entitled to possess, and that because of these referred to "slight" changes and "inexpensive removal of certain parts of the course," would not have destroyed its attractiveness.

It is a matter of common knowledge of the Courts and the general public that a miniature golf course or any other golf course, must be an attractive situation, must be upon a proper kind of area and have the proper symmetrical construction and appearance. To have twisted one side of this course to have brought all of it back within lot No. 7, would have given that side the same appearance that a broken leg on an individual,

which was twisted out of all of its normal shape, upon setting an improper union would give to the body.

So what these defendants want is for the Court to rewrite the contract after they have taken the property off, by its decree announced one day after the principal time set forth in the contract would have expired. So we must look at what the situation would have been if that had been done:

"When a written agreement has been reformed, it stands in all respects, and has identically the same force and effect between the parties as though originally made in its reformed condition, for equity regards that as done which ought to have been done. A reformed instrument is substituted for and is in lieu of the original instrument and takes effect from the date of the original instrument." Gibson's Suits in Chancery, 5th Edition, Sec. 992, p. 233.

Could it be said that where the owner of the land upon which more than 21 feet of this miniature golf area is located outside of its proper boundary, and who is demanding additional rent at some amount from the complainant, in event he kept it, together with the rent of $140.00 per month, would or would not constitute a variance of a substantial amount from the original intention and knowledge that the complainant had when this contract was entered into? The fact that the defendants come in and say we want to take care of this situation in this way, would not justify the Court in rewriting the contract so as to make it conform to the opinion of the defendants after they had made it impossible of such performance, regardless of the fact that defendants claim they did not know that a portion of this golf course was

over on the land of owner of lot No. 6 makes no difference. This information from the owner of this overlapping area was the first intimation that the purchaser had that he had contracted to buy something that the defendants themselves did not have a substantial part of. The fact also remains that very promptly when he found this out, in addition to the other matters set out in the original bill, he wrote the letter and forwarded to the parties the keys etc. that he had, tendering back everything that he had gotten from them and demanding a rescission of the contract and payment of the cash which he had received, and the cancellation of his note soon after he got this information about the overlap.

We do not think that we have to depend alone, nor did the Court below, upon that portion of the Uniform Sales Act in force at the time this contract was executed, though it did provide:

"* * * if the goods have already been received, return them to the seller and recover the price or any part thereof which has been paid." T.C.A. sec. 47-1269, subsection (1) (d), last sentence.

The authorities relied upon in the Chancellor's decree, together with that expressed in this opinion in True v. J. B. Deeds & Son, 151 Tenn. 630, 632, 634, 271 S.W. 41, 42, Justice McKinney writing that opinion for the Supreme Court, said: "The equitable remedy of cancellation is a discretionary one." He quotes from 9 Corpus Juris, 1161, saying:

"An application to a court of equity for the rescission, cancellation, or delivering up of agreements and securities is not founded on an absolute right, as in case of an action at law on a contract or in tort, but is rather

an appeal to the sound discretion of the court, which in granting or refusing the relief prayed acts on its own notions of what is reasonable and just under all the surrounding circumstances. The court before granting the rescission or cancellation of a contract often considers whether the relief prayed would be attended with hardship or not, or whether a superior or inferior equity arises on the part of the applicant.''

He also quotes with approval from 9 Corpus Juris, 1159 in which it is said:

''A court of equity entertains a suit for the express purpose of procuring a contract or conveyance to be canceled and renders a decree conferring in terms that exact relief. A court of law entertains an action for the recovery of the possession of chattels, or, under some circumstances, for the recovery of land, or for the recovery of damages, and although nothing is said concerning it either in the pleadings or in the judgment, a contract or conveyance, as the case may be, is virtually rescinded; the recovery is based on the fact of such rescission and could not have been granted unless the rescission had taken place. The fact that the same word, 'rescission,' is used to designate both the equitable remedy of cancellation and the termination of a contract by the act of a party has been productive of no little confusion. 'In many of the cases for rescission in equity language is used from which it might be inferred that precisely the same principles govern in suits in equity that are applied to determine the right of the party to sue at law.' ''

In addition to that which has heretofore been said, it is one of the functions of the Court of equity to require the parties who seek an equitable right, to do

equity themselves. If defendants were relying upon a reformation of the contract they should not have removed the property from the involved area.

We are unable to see anything that the complainant may have done in order to have put upon him the requirement that he keep this particular contract, and comply with its condition, under the facts of this case. He who seeks equity must do equity.

There seems to be some argument in the brief of the defendants and in some of the testimony of Mr. Gatti, that there was some effort on his part to try and reach an amicable agreement. But when taken into consideration with the fact that he admits he did not pursue a course to bring this matter to an equitable conclusion without a final trial in this case, he relies upon the often stated remedy that the complainant had an attorney and intimates that he would have to deal with the attorney. While that is true from the standpoint of being fair and ethical with opposing counsel, there seems to be no effort on the part of these defendants except to foreclose this deed of trust just as quickly as they could and which they did, putting the whole matter beyond the power of the Court to remedy the situation other than by a rescission. (See letter from defendant Gatti to complainant, pages 10 and 11 this opinion).

Theretofore, it is our opinion that the Chancellor did the equitable thing by the cancellation and rescission of the original agreement, and decreeing for recovery of the cash paid, together with cancellation of notes and trust deed evidencing the final payment of $4,000.

As a matter of equity, the jury should never have had submitted to it Issue No. 1, for it is not determinative of

any matter under the facts as revealed by this record. The assignments of error with respect to failure of consideration will be affirmed. In other words, the answer to Question No. 1 as posed by this Court and herein set out above, is that there is a failure of a substantial part of the consideration in the fact that a portion of this golf course lay without the area granted, and that it could not be successfully operated by the suggested changes which the defendants undertake to set out in motion to amend and have the Court rewrite their original contract. Therefore, the decree of the Chancellor in that regard is affirmed. The cost will be adjudged against the appellants, defendants below, and sureties on their appeal bond.

Decree will be entered in this Court in accord with this opinion, affirming the decree of the Court below, together with interest on the judgment of $4,000 from the date of the filing of the bill in this cause in the lower Court. There will not be interest upon the judgment of $4,000 up to the date of that judgment and then interest on interest, it will be simple interest on the $4,000 from the date of the filing of the bill in this cause, together with a decree for the cancellation of the note or notes for the deferred purchase money note and the chattel trust deed securing same.

Carney and Bejach, JJ., concur.