C. Robert LLOYD and wife, Virginia McGuire Rier Lloyd, et al., Plaintiffs-Appellees,

v.

Doyle O. TURNER and wife, Bernice L. Turner, et al., Defendants-Appellants.

Court of Appeals of Tennessee, Western Section.

April 18, 1980.

Certiorari Denied by Supreme Court July 28, 1980.

Seymour S. Rosenberg, Memphis, for defendants-appellants.

Charles B. Welch, Jr., Farris, Hancock, Gilman, Brannan & Lanier, Memphis, for plaintiffs-appellees.

EWELL, Judge.

Plaintiffs filed suit in the Chancery Court of Shelby County seeking relief with respect to certain transactions with defendants relating to the purchase by Virginia McGuire Rier Lloyd, one of the plaintiffs, of a one-half interest in Sonic Recording Studio in Memphis, Tennessee. Plaintiffs sought rescission of the transactions and both compensatory and punitive damages. The principal defendants, Doyle O. Turner and wife, Bernice L. Turner, filed a counter-action seeking to recover from plaintiffs, C. Robert Lloyd and wife, Virginia McGuire Rier Lloyd, their share of the expenses incurred in the operation of Sonic together with compensatory and punitive damages for slander and defamation of character. The case was tried before Chancellor Wil V. Doran who found for the plaintiffs and rescinded the transactions upon condition that the plaintiffs refund to defendants the sum of $4,000.00 allegedly paid by defendants to procure equity for plaintiffs in certain real estate.

Defendants appealed presenting to this Court four issues for review which collectively present the single insistence that the Chancellor erred in rescinding the transactions. Plaintiffs present an additional issue insisting that the Chancellor erred in ordering them to pay to defendants the sum of $4,000.00 as a condition precedent to the rescission of the transactions.

Virginia McGuire Rier Lloyd and her daughter, Virginia Pamela Rier Branden-

berg, two of the plaintiffs, owned a residence located at 911 Bluebird Lane, Memphis, Tennessee; and Bernice L. Turner, one of the defendants, owned the Sonic Recording Studio, located at 1659 Madison Avenue, Memphis, Tennessee. In September, 1976, Mrs. Lloyd and Mrs. Turner entered into discussions with respect to the possibility of Mrs. Lloyd purchasing a one-half interest in Sonic. These discussions led to the execution of a "Contract of Sale" dated October 12, 1976, which was drafted by attorney George Harrison. The contract between Mrs. Turner, as seller, and Mrs. Lloyd, as buyer, provided, in substance, the following:

(1) Seller conveys to buyer a one-half undivided interest in and to the business, equipment, management, goodwill, artists contracts, lease and operation of the Sonic Recording Studio.

(2) Buyer conveys to seller by warranty deed the real estate located at 911 Bluebird Lane, Memphis, Tennessee. Buyer agrees to pay all unpaid City and County real property taxes and seller agrees to assume first mortgage indebtedness against said property held by Equitable Life Assurance Society of the United States having a principal balance of $4,503.48 and the second mortgage indebtedness against said property held by First National Bank of Memphis having a principal balance of $10,667.55 and further agrees to pay all closing costs with respect to the transfer.

(3) All profits and liabilities of Sonic will be shared equally by the buyer and seller from and after October 12, 1976.

(4) The recording operation of Sonic will be supervised and operated by Doyle O. Turner, Sr. and Doyle Turner, Jr.; and the office management and regular business affairs of Sonic will be jointly and equally shared by the seller and the buyer.

(5) Seller conveys to buyer a one-half interest in all artists contracts held by Sonic and all future contracts will be held jointly and equally between the buyer and the seller.

(6) A one-half interest in the equipment of Sonic, itemized and listed in the contract, is conveyed from seller to buyer and hereafter will be owned jointly by them.

(7) That all of the listed equipment is free and unencumbered with the exception of two specified items in connection with which there is an indebtedness of $5,100.00 owed to Foner Research, Inc. payable in monthly installments of $300.00 each, which indebtedness is assumed jointly by buyer and seller as a part of the liability of Sonic.

(8) That the contract contains the final and entire agreement between the parties who shall not be bound by any terms, conditions or representations not therein contained.

In conflict with the last mentioned provision of the contract, the uncontroverted proof in the case was to the effect that there were additional, material agreements between the parties which constituted a substantial part of the consideration for the sale and purchase. In paragraph no. 10 of their complaint plaintiffs allege, among other things, as follows:

After a series of meetings, Plaintiff, Mrs. Lloyd, and Defendants, Mr. and Mrs. Turner, agreed that they would enter into this business venture upon the condition that, among other things, Defendants, Mr. and Mrs. Turner, would secure a home for Plaintiff, Mrs. Lloyd, at 4559 Almo Avenue, Memphis, Tennessee 38118, upon which Defendants would make a down payment in the amount of Four Thousand ($4,000.00) Dollars, and that Defendants, Mr. and Mrs. Turner, would then occupy Mrs. Lloyd's home at 911 Bluebird Lane, Memphis, Tennessee 38116.

In paragraph no. 15 of the complaint plaintiffs refer to a "Real Estate Sale Contract" dated October 8, 1976, a copy of which was exhibited to the complaint. The contract was executed by Mrs. Lloyd as purchaser and Alvin Porter of Rebel Realty Co. as seller. The purchaser's address was shown to be "Doyle Turner". The subject proper-

ty was described as "4559 Almo" and the contract provided, among other things, as follows:

(1) Purchaser agrees to pay seller $4,000.00 in cash at time of closing for seller's entire equity and assume a present loan balance of approximately $27,600.00 payable at $259.00 per month held by Leader Federal.

(2) Closing to be as soon as all necessary papers are processed and approved.

(3) Possession to be on October 11, 1976.

The Chancellor based his decision primarily upon the agreement of the parties relating to the Almo property. Because of the emphasis given to this phase of the relationship and the fact that it was not included in the "Contract of Sale" we deem it appropriate to quote directly from that portion of the testimony of each of the three principal witnesses directed to the Almo property. Bernice Turner testified, in part, as follows:

"Q. All right. And how did the Almo property come into the picture?

"A. All right. We both talked that day, and the following week, the best I remember it was kind of in the middle of the week, she said—she called me back and she said, "I've thought over the agreement that we've made", and which was that I swap half interest in the artists and in the studio for the equity she had in her home, and she was willing to do this. But when she called me she said, "I have got to have a place for me and my son." Her other children did not live at home. "For me and my son to move to." She said, "I don't want to move into an apartment." And I said, "Well, I have a friend, Bob Newman", which she knew, too, and I said, "he is buying a home at 911 Bluebird."

"Q. No. 911 Bluebird is hers.

"A. I mean—55—well, I didn't know the address at that time.

"Q. Okay. The Almo address?

"A. But anyway I told her that he had a home, that he had mentioned to me, he knew we lived in an apartment, and he said, one day, "Bernice, why don't you let me sell you my home," and I said, "What do you want for it?" and he said, "Well, I want forty or forty-five hundred dollars" —he said, no, he said, "I've got forty-five hundred dollars equity in the home." And I said,—well—, I asked him where it was at and he told me, and I said "No, I'm not interested in it." And so when we were talking, I said—then I told her at this time about the home on—that Bob had for sale, and I said we could go talk to him. And I called Bob—do you want me to go ahead with what happened on that?

"Q. Did you make arrangements for Virginia to see the home on Almo?

"A. Right. I called Bob and I asked him could we go look at the home.

"Q. Did you make arrangements for her to see it?

"A. Right.

"Q. Did she see it?

"A. Right

"Q. Did she like it?

"A. Right.

"Q. Did she want it?

"A. Right.

"Q. Did she want you to pay the four thousand dollars down payment or equity?

"A. Right.

"Q. Did you actually pay four thousand dollars?

"A. I did.

"Q. Cash money?

"A. I did.

"Q. Where did you get the money?

"A. Out of my savings account in Jonesboro, Arkansas.

"Q. And you paid that in her behalf?

"A. Right.

"Q. And she signed a contract which has already been made an exhibit?

"A. Right.

"Q. Do you know whether or not anything else had to be done on her part for that property to be closed?

"A. Yes, I do.

"Q. What?

"A. Well, she was supposed to—okay. She had to go to Leader Federal and make application for a loan for it to be changed over.

"Q. Transferred to her name?

"A. Right.

"Q. Was she instructed to do that in your presence?

"A. She was in my presence.

"Q. By the agent?

"A. And I told her. By Alvin Porter, yes, she was.

"Q. All right. And did she ever do that?

"A. No, she did not. The first I knew that she did not was when I received a letter from Leader Federal. I don't remember just how the letter come about. I believe it come to us saying they were foreclosing on the house, and I called Alvin, and he said she had not paid a payment on it."

The testimony of Mrs. Lloyd included the following:

"A. Well, this was just within a couple or three days, you know, that she came back with this idea. She said—She offered all of that, and she said, "I have a friend who has a home that he wants to sell. His name is Robert Newman," and she said—

"Q. (Interposing) Did you know Robert Newman?

"A. No, sir, I did not know Robert Newman.

"Q. Who is he?

"A. I know now he owns a night club on 51.

"Q. Go Ahead.

"A. And, so, she came up with the idea of this home, and she said, "If you'll let me handle it, I believe that I could get it a lot cheaper, because he's a friend of mine." So, she said that she would put $4,000.00 down to buy the equity out of it and put it in my name, and I could pick up the notes, and I never did get any of the house or anything."

Attorney George Harrison who drafted the "Contract of Sale" and other related instruments, testified:

"A. After the papers were signed, closed and I had read the contract to both of them, and all of them were satisfied, we were sitting there talking, and Mrs. Turner spoke up and said, "I guess maybe we should have told you that Mrs. Lloyd has moved into the property we bought for her, and I said, "Was that a part of this transaction," and they said, "Yes, but that's already completed. We've already done that. She has moved into the property. We've paid the down payment on it," and I didn't even know where the property was. She had a receipt, I believe, for $4,000.00; and, as I recall it, she showed me the receipt, and that's all I knew about the property, and that was all that was discussed in my office."

With respect to the Almo property defendants proved that on October 8, 1976, they paid $2,000.00 in cash to Robert Newman and $2,000.00 in cash to Alvin Porter of Rebel Realty Co. Mrs. Lloyd took possession of the property on or about October 11, 1976, and lived there for some six to seven months. However, title to this property was never transferred to Mrs. Lloyd, and the title was never held by Robert Newman. To the contrary, certified copies of deeds filed in the record show that on June 3, 1975, David F. Dowdie and wife, Rebecca A. Dowdie acquired this property and gave a first deed of trust to Frances P. Northern, trustee, to secure indebtedness payable to Leader Federal Savings and Loan Association of Memphis; that the property was conveyed from Dowdie and wife to Rebel Realty Co., Inc. on March 19, 1976, subject to the Leader Federal indebtedness; that on May 4, 1977, a foreclosure sale was held under the Leader Federal deed of trust and the property was purchased by Leader Federal; and that on December 12, 1977, Leader Federal conveyed the property to Freddie V. Sigler and wife, June H. Sigler. Although Alvin Porter, Rebel Realty Co. and Robert Newman were all joined originally as defendants in the case, they were voluntarily dismissed by plaintiffs prior to trial. Neither Alvin Porter nor Robert Newman testified in the

case, and the interest of Alvin Newman, if any, is not explained in the record. While the defendants paid the total sum of $4,000.00, only $2,000.00 was paid to Rebel Realty Co. although the real estate sale contract provided for a payment of $4,000.00 to that company. As a consequence of not having legal title to the property and the substantial delinquency in payment of the first mortgage indebtedness Mrs. Lloyd was evicted at approximately the time of the foreclosure sale by Leader Federal.

Transfer of title to the Bluebird property from Mrs. Lloyd and her daughter to Turner and wife was accomplished by warranty deed prepared by attorney Harrison. The Turners took possession on or about October 21, 1976, and proceeded to make improvements to the property. A short time thereafter Mrs. Lloyd discovered the assets of Sonic were not nearly as valuable as she had assumed; and she became aware of facts about Sonic, its past business relationships and its previous owner which disturbed her greatly. Consequently she called upon the Turners to rescind the entire transaction and return the Bluebird property to her although she was financially unable to return to them the $4,000.00 which they had paid to Newman and Porter. After it became apparent that the parties could not agree, Mrs. Lloyd proceeded with the filing of suit on March 2, 1977.

A substantial portion of the proof in this case relates to the value of Sonic and its assets. Mrs. Lloyd insists that fraudulent misrepresentations were made to her to induce her to purchase the one-half interest and that the consideration received was so inadequate as to constitute fraud and shock the conscience of the Court. On this basis she seeks rescission and damages. However, the Trial Judge specifically found that the plaintiffs had failed to carry the burden of proving by a preponderance of the evidence that there was such an inadequacy of consideration as to be deemed a badge of fraud; and he based his decision on a failure of consideration in connection with the Almo property rather than an inadequate consideration. In his opinion given from

the bench at the conclusion of all the proof in the case Chancellor Doran stated, in part, as follows:

However, there is more consideration, cited in the contract. She was also to receive a house on Almo. They were to pay four thousand dollars, I think it was, or four thousand five hundred, it seems like there was a little confusion, but four thousand, I believe, is what the proof showed. And it's not real clear—I'm not criticizing counsel at all, it's a very confusing and hybrid type of an action because of the contract itself, but there's many points that are just real unclear, whether there was an equity sale, whether she was to pay the four thousand dollars for someone's equity. Apparently that was the case. That's the best inference that the Court can glean from the proof. And if that's true she doesn't have to go down and close anything. Once she pays four thousand dollars or whatever the owner wants, she's entitled to a deed. Then if they won't transfer the loan, then she can go down there. How is she going to make payments to Leader Federal without a deed? She doesn't know if she'll even own the property. It's the duty of the promisor. It's part of the promise, and you have a deed to that. Now it's your obligation to make the payments and make arrangements with Leader Federal to transfer the loan, or the obligation for the loan.

I can't tell from this proof that she ever had anything upon which she was obligated to pay. She was in the house, but she—there's no proof in this record about a deed of any sort, about title of ownership.

Is that a failure of consideration? It would have to be. I'm not saying inadequate, because the Court can't find that. I'm not going to say that there was a flim-flam or whatever, because she just had the feeling that there was such an inadequacy, and I want to make that clear.

But there was a failure of part of the consideration. She's never received a

deed to that house, or at least it hasn't been exhibited in this proof, or it was never tendered. She doesn't even have to be there when a deed is prepared. Once they get their four thousand dollars the owner of the house signs the deed which can be mailed to her. She doesn't have to attend any closing for that.

On March 28, 1979, a "Decree Rescinding Contract of Sale and Warranty Deed" was entered decreeing as follows:

(1) That the Contract of Sale and the Warranty Deed are rescinded, set aside and held for naught conditioned upon plaintiffs paying to defendants the sum of $4,000.00.

(2) That all of plaintiffs' interest in and to the Sonic Studio including furniture, fixtures, equipment and Artists Management Contracts is divested out of plaintiffs and vested in defendants.

(3) That plaintiffs deposit in the registry of the Court the sum of $4,000.00 which sum shall be delivered by the Clerk to the defendants upon the defendants executing and delivering a warranty deed conveying the Bluebird property to plaintiffs.

(4) That defendants have thirty days from and after delivery of the deed and acceptance of the $4,000.00 to deliver possession of the Bluebird property to plaintiffs.

(5) That defendants' cross-action against plaintiffs is dismissed.

■ This non-jury case comes to us pursuant to T.C.A. 27–303 for a trial *de novo* accompanied by a presumption of the correctness of the judgment below and that judgment will be affirmed unless there is an error of law or unless the evidence is found by this Court to preponderate against the judgment below. *Smith v. Jarnigan*, 58 Tenn.App. 668, 436 S.W.2d 310 (1968). The evidence does not preponderate against the judgment below, and we find no error of law. Accordingly, we affirm the judgment of the Trial Court in all respects.

With respect to the distinction between inadequacy of consideration and failure of consideration, Judge Crownover speaking for the Middle Section of this Court in an opinion filed October 10, 1936, in the case of *Farrell v. Third National Bank in Nashville*, 20 Tenn.App. 540, 101 S.W.2d 158 (1937) stated:

There is a vast difference between inadequacy of consideration and failure of consideration. "Inadequacy of consideration" is, as the term implies, a consideration not adequate or equal in value to the thing conveyed, and where the parties contract with a knowledge of what they are doing inadequacy of consideration is no grounds for avoiding the contract. Inadequacy of consideration is not a ground for rescission unless it is mixed with fraud or is so great as to shock the conscience of the court. 13 C.J. 365, 612. Failure of consideration is in fact simply a want of consideration. (13 C.J. 368), and if a partial failure of consideration is such as to affect the whole contract and defeat the object of the contract, then it may be a ground for rescission. 13 C.J. 368.

"Aside from enactments of this kind, the general rule appears to be that a partial failure of consideration will justify a rescission or cancellation of an obligation in equity if the contract is entire and the consideration therefore not apportionable." 1 Black on Rescission, 424, Sec. 159.

"A partial failure of performance of a contract will not give ground for its rescission unless it defeats the very object of the contract or renders that object impossible of attainment or unless it concerns a matter of such prime importance that the contract would not have been made if default in that particular had been expected or contemplated." 1 Black on Rescission, 512, Sec. 198.

■ From the proof we find that the matter of title to the Almo property was of such importance that the contract would not have been made if default in that particular had been expected or contemplated. Therefore, the Chancellor did not err in ordering a rescission of the entire transaction for failure of that portion of the con-

sideration. See also *Cavallo v. Gatti*, 54 Tenn.App. 529, 392 S.W.2d 843 (1965); *Isaacs v. Bokor*, 566 S.W.2d 532 (Tenn. 1978); 17A C.J.S. Contracts § 420.

■■■ Plaintiffs insist that the Court erred in ordering payment of $4,000.00 to defendants since this sum was not received by plaintiffs and at no time did they hold legal and/or equitable title to the Almo property. Generally, a party seeking rescission of a contract must return or offer to return that which he has received under it, and thus return the other party as nearly as is possible to his status before the contract. *Moore v. Howard Pontiac-American, Inc.*, 492 S.W.2d 227 (Tenn.1973). See also *Kenner v. City Nat. Bank*, 164 Tenn. 119, 46 S.W.2d 46 (1932). The plaintiffs in their amended answer to defendants' cross-action fulfilled this condition by asserting the following:

> Plaintiffs emphatically deny that they received Four Thousand Dollars ($4,000.00) from Defendants, Doyle O. Turner and Bernice L. Turner as alleged in Paragraph 5 of the cross-action. If the proof reveals, however, that Plaintiffs have received from or are indebted to Cross-Plaintiffs in the amount of Four Thousand Dollars ($4,000.00), they now tender Four Thousand Dollars ($4,000.00) to Cross-Plaintiffs.

While plaintiffs did not in fact receive $4,000.00 from defendants and did not take title to the Almo property, they did have possession of the Almo property for a number of months. It is uncontroverted that defendants paid the sum of $2,000.00 to Newman and the sum of $2,000.00 to Porter, and in order to return defendants as nearly as possible to their status prior to the contract it is necessary that they be reimbursed as ordered by the Trial Court. Therefore, we find no error in this portion of the judgment below.

It results that the judgment of the Trial Court is in all things affirmed, and this cause is remanded for the enforcement of that judgment. The costs on appeal will be assessed against the defendants-appellants.

MATHERNE and SUMMERS, JJ., concur.